No. 26-1103

# In the United States Court of Appeals
# for the Tenth Circuit

COMMITTEE OF FIVE, INC. d/b/a
XX-XY ATHLETICS,

*Plaintiff-Appellant*

v.

AUBREY C. SULLIVAN, Director of the Colorado
Civil Rights Division, in her official capacity, *et al.*,

*Defendants-Appellees*

On appeal from the United States
District Court for the District of Colorado
Hon. Regina M. Rodriguez, District Judge
(Dist. Ct. No. 1:25-cv-1668)

BRIEF OF INSTITUTE FOR FREE SPEECH AS
*AMICUS CURIAE* IN SUPPORT OF
PLAINTIFF-APPELLANT AND REVERSAL

Alan Gura
Brett R. Nolan
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., N.W.
Suite 801
Washington, DC 20036
202-301-3300
bnolan@ifs.org
*Counsel for amicus curiae*

June 15, 2026

CORPORATE DISCLOSURE STATEMENT

Counsel for *amicus curiae* Institute for Free Speech, Brett R. Nolan, certifies that IFS is not a subsidiary or affiliate of a publicly owned corporation and no publicly owned corporation has a substantial interest in the outcome of this litigation.


<u>/s/ Brett R. Nolan</u>

TABLE OF CONTENTS

Corporate Disclosure Statement.................................................................i

Table of Contents.................................................................................ii

Table of Authorities ......................................................................... iii

Interest of *Amicus Curiae* ....................................................................1

Introduction and Summary of Argument...............................................2

Argument ..........................................................................................3

    I.    Laws regulating misgendering violate the First Amendment. .....3

       A.   Pronouns have always conveyed ideological messages. ..............3

       B.   The First Amendment protects against laws compelling people to either stay silent or espouse views that they reject.....7

    II.   The district court's wait-and-see approach to standing exacerbates the unique threat to free speech that Colorado's law poses. ......................................................................9

Conclusion.......................................................................................13

TABLE OF AUTHORITIES

**Cases**

*Am. Booksellers Assoc. v. Hudnut,*
  771 F.2d 323 (7th Cir. 1985)...............................................................12

*Cohen v. California,*
  403 U.S. 15 (1971)...............................................................................2

*Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.,*
  158 F.4th 732 (6th Cir. 2025) (en banc)...........................................6, 12

*First Choice Women's Res. Ctrs., Inc. v. Davenport,*
  146 S. Ct. 1114 (2026)......................................................................11

*Fulton v. City of Philadelphia,*
  593 U.S. 522 (2021)..........................................................................11

*Iancu v. Brunetti,*
  588 U.S. 388 (2019).............................................................................9

*Janus v. AFSCME, Council 31,*
  585 U.S. 878 (2018).........................................................................6, 7

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021).............................................3, 6, 7, 9, 10

*Snyder v. Phelps,*
  562 U.S. 443 (2011).............................................................................6

**Statutes & Regulations**

Colo Rev. Stat. § 24-34-301(10).............................................................3, 10

Colo Rev. Stat. § 24-34-301(3.5)..................................................................3

Colo Rev. Stat. § 24-34-301(9).....................................................................3

Colo Rev. Stat. § 24-34-601(2)(a).............................................................3, 8

**Other Authorities**

Glenna Goldis, *Speech Under Fire: How Gender Ideology
  Threatens Free Speech* (Inst. Free Speech Nov. 24, 2025),
  https://youtu.be/7-J9hA3Pwgg.........................................................10, 12

Joseph Epstein, *Is There a Doctor in the White House? Not if You Need an M.D.*, Wall St. J. (Dec. 11, 2020), https://bit.ly/3ZUXpfS .................................................................. 3

*Mr. Jacob Bright's Bill to Remove the Electoral Disabilities of Women*, The Times (London), Apr. 30, 1873 .......................................... 5

Teresa M. Bejan, *What Quakers Can Teach Us About the Politics of Pronouns*, N.Y. Times (Nov. 16, 2019), https://bit.ly/4g7Bw32 ............................................................... 4

INTEREST OF *AMICUS CURIAE*[1]

The Institute for Free Speech is a nonpartisan, nonprofit organization dedicated to the protection of the First Amendment rights of speech, assembly, petition, and press. Along with scholarly and educational work, IFS represents individuals and civil society organizations in litigation securing their First Amendment liberties. IFS has an interest in this case because the panel's decision will have widespread effects within this circuit, influencing how governments regulate speech and mandate ideological conformity in other contexts. The decision will thus affect many different people who wish to exercise their First Amendment rights.

---

[1] No counsel for a party authored this brief in whole or in part, nor did any person or entity, other than *amicus* or its counsel, financially contribute to preparing or submitting this brief. By separate motion, IFS requests leave to file this brief.

INTRODUCTION AND SUMMARY OF ARGUMENT

Words matter. Even small changes in language can dramatically alter the meaning of a message. "End the Draft" says something very different than "Fuck the Draft." *See Cohen v. California*, 403 U.S. 15, 16, 25–26 (1971). Criticizing the President for overreach sends a different message than calling him a fascist or dictator. The words we choose are not just important—they are often indispensable to the views we want to express.

That's why the First Amendment protects not just the right to speak on one side of an issue, but also the "words" one might use to deliver the message. *Id.* at 26. Were it otherwise, "governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views." *Id.*

Today's debate over gender ideology embodies that threat. While pronouns and similar kinds of language have long been at the center of social and political conflict, few movements have so heavily depended on demands that one side acquiesce to the language preferences of the other. But making those demands is one thing. Codifying them into law is another.

Yet that's precisely what Colorado's law does here. Colorado's anti-discrimination law prohibits speech if it makes individuals who demand to be referred to with biologically inaccurate pronouns feel "unwelcome." Colo Rev. Stat. § 24-34-601(2)(a); *id.* § 24-34-301(3.5), (9), & (10). In doing so, Colorado weighs in on one of the most hotly contested debates in the public square today—and it bans one side of the debate from choosing which words they use to express their view.

ARGUMENT

I.   LAWS REGULATING MISGENDERING VIOLATE THE FIRST AMENDMENT.

A. Pronouns have always conveyed ideological messages.

"[G]ender identity [is] a hotly contested matter of public concern," *Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021), but the notion that "titles and pronouns carry a message," *id.* at 507, is not. Although people have strong preferences about how they should be addressed, the mode of referring to others is often fraught with social and political meaning. *See, e.g.*, Joseph Epstein, *Is There a Doctor in the White House? Not if You Need an M.D.*, Wall St. J. (Dec. 11, 2020), https://bit.ly/3ZUXpfS. And pronouns are no exception. Pronouns, in fact, might be "the most political parts of speech," having sat at the

center of political and social debates for centuries. Teresa M. Bejan, *What Quakers Can Teach Us About the Politics of Pronouns*, N.Y. Times (Nov. 16, 2019), https://bit.ly/4g7Bw32.

Seventeenth-century Quakers rebelled against the pronoun standards of their day, which proscribed what was then the second-person plural pronoun, "you," to address a higher-class individual, while assigning "thou" and "thee" to the commoners. But the egalitarian and humble Quakers used "thou" and "thee" with everyone, to some people's consternation. *Id.* "[Some] Quakers produced pamphlets . . . to argue that their use of 'thee' and 'thou' was grammatically—as well as theologically and politically—correct." *Id.*

Quakers were not alone in being "sensitive to the humble pronoun's ability to reinforce hierarchies by encoding invidious distinctions into language itself." *Id.* Pronouns took center stage during the women's suffrage movement. "In both England and the United States there was . . . a lot of talk about the language of the election laws, and a lot of that wrangling concerned the politics of the pronoun *he*." Baron, *supra*, at 41. Activists like Susan B. Anthony and Elizabeth Cady Stanton argued that the masculine pronoun—as it appears "in all the

constitutions and laws"—must refer to both women and men, or else women would be exempt from all sorts of criminal laws. *Id.* at 48–49. And some proponents of universal suffrage sought to make that explicit by modifying the law so that "words referring to men also included women." *Id.* at 39.

But for those opposed to granting women the right to vote, using the masculine pronoun "he" was not an oversight that needed clarification. Nor was it simply a matter of grammar. Masculine language reinforced "how absolutely inconceivable and unnatural the idea of Women's Suffrage [had] hitherto seemed." *Id.* (quoting *Mr. Jacob Bright's Bill to Remove the Electoral Disabilities of Women*, The Times (London), Apr. 30, 1873, at 9). And so opponents of women's suffrage urged people to "watch [their] pronouns" not because it was good grammar, but to stop activists from effecting change by "revolutioniz[ing] the commonest modes of thought and expression." *Id.* at 39–40.

Yet society did change, and with it came changes to how people viewed using gendered pronouns. "[I]n the latter half of the twentieth century, gendered pronouns became imbued with new meaning" as "[t]he feminist movement came to view the generic use of masculine

pronouns as 'a crucial mechanism for the conceptual invisibility of women'" and a means of reenforcing prejudice. *Meriwether*, 992 F.3d at 508–09 (citation omitted). So while the 19th-century activists for women's suffrage fought legal battles to interpret masculine pronouns as gender neutral, Baron, *supra*, at 46–72, "the feminist call in the 1970s for an end to sexist language led to a sharp decline in generic *man* and *he* in edited prose," *id.* at 40.

Today, "the use of gender-specific titles and pronouns has" once again "produced a passionate political and social debate." *Meriwether*, 992 F.3d at 508. "Pronouns are a proxy for an entire worldview." *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 775 (6th Cir. 2025) (en banc) (Thapar, J. & Nalbandian, J., concurring). No one really doubts that "gender identity" is among the "sensitive political topics [that] are undoubtedly matters of profound 'value and concern to the public.'" *See Janus v. AFSCME, Council 31*, 585 U.S. 878, 913–14 (2018) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). And pronouns are the quintessential means by which people express their views on this issue.

Thus, "more and more people are taking the gender debate away from the medics and grammarians and making it their own." Baron, *supra*, at 120. "Never before have titles and pronouns been scrutinized as closely as they are today for their power to validate—or invalidate—someone's perceived sex or gender identity." *Meriwether*, 992 F.3d at 509. "All this points to one conclusion: Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id.* at 508.

### B. The First Amendment protects against laws compelling people to either stay silent or espouse views that they reject.

Because people's pronoun usage reflects their beliefs and values surrounding this contentious topic, the use of non-standard pronouns is often viewed (by speakers and listeners alike) as acquiescence in a sociopolitical theory that many people profoundly oppose. But "[c]ompelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command." *Janus*, 585 U.S. at 892.

Consider how easy this case might be if the government enacted a law that banned calling Russia's invasion of Ukraine "genocidal," so as

to ensure that those with Russian heritage would not feel "unwelcome." Colo. Rev. Stat. § 24-34-601(2)(a). Or suppose that Colorado required its citizens to respect not just chosen pronouns or names but titles as well, prohibiting Coloradans from calling Donald Trump a "dictator" instead of "the president." Would anyone doubt such a law's unconstitutionality?

Yet Colorado is not alone in adopting the similarly ideological speech mandate at issue here. Even the district court below enforces conformity through mandates requiring attorneys to "[r]efer to all other persons by" their "applicable pronouns" and encouraging parties to alert the court if "the wrong pronoun [is] used." *See* Civ. Prac. Standard 43.1A(a)(1), (2), https://bit.ly/49FVXmd. Such speech regulations often come disguised as rules about "decorum" or "discrimination." But in reality, they target ideas that offend those in power.

Colorado's anti-discrimination law is no exception. The state's ban on misgendering is built on the view that using the wrong pronouns can be "hostile" and thus must be stopped. *See* Dkt. 85-1 p.211. So Colorado wields its power to prevent people from sharing a message that might offend.

That violates the First Amendment. No government can police language to allow messages it likes, while prohibiting those it disapproves—even when the language might "provoke[e] offense and condemnation." *Iancu v. Brunetti*, 588 U.S. 388, 394 (2019). That pronouns and other forms of gendered language inherently convey ideological messages leaves no question that Colorado's attempt to regulate their use in only one direction violates the First Amendment.

II. THE DISTRICT COURT'S WAIT-AND-SEE APPROACH TO STANDING EXACERBATES THE UNIQUE THREAT TO FREE SPEECH THAT COLORADO'S LAW POSES.

The district court denied the request for a preliminary injunction because it did not believe the plaintiff faced a sufficiently credible threat of enforcement. Dkt. 115 at 18–19. As the appellant ably explains, the district court misinterpreted Colorado law and misapplied the relevant precedent on pre-enforcement standing. Appellant's Br. at 36–43. But the standing dispute here reveals a deeper problem with Colorado's attempt to control the dialogue about gender ideology without facing judicial scrutiny.

The gender-ideology movement is uniquely dependent on "the social control of language." *See Meriwether*, 992 F.3d at 508. It is common for

people to think that "transgender identity is mostly about biology and science and medicine" and that the language "trails along after." Glenna Goldis, *Speech Under Fire: How Gender Ideology Threatens Free Speech* at 3:18–40 (Inst. Free Speech Nov. 24, 2025), https://youtu.be/7-J9hA3Pwgg. But language is "central" because "there is no biological basis for transgender identity." *Id.* 3:46–59. Rather, the very concept of gender identity—as Colorado's statute recognizes—turns on "an individual's innate sense of the individual's own gender." Colo. Rev. Stat. § 24-34-301(10). In other words, the gender-ideology movement requires that other people accept the belief "that you are what you say you are." Goldis, *supra*, at 3:58–4:01.

That makes "the social control of language," *Meriwether*, 992 F.3d at 508, crucial. Consider a woman who identifies as non-binary. "If you don't have people calling the woman 'they/them,' then [people] forget and it kind of all falls apart." Goldis*, supra*, at 4:20–5:30. Language, in this case, does not simply reinforce an otherwise apparent attribute. It's the *only* way to recognize someone's self-identified gender.

So what does that have to do with standing? Colorado insists that misgendering or deadnaming are not "per se" unlawful because the

statute requires "a close analysis of all facts and context." Dkt. 85-1 p. 211–12 (¶11).[2] The state thus concedes that such language might violate the law in some circumstances—it just cannot tell the plaintiff (or anyone else) what those circumstances might be. And as the district court saw it, this means the plaintiff lacks standing for its pre-enforcement suit.

But "[t]he value of a sword of Damocles is that it hangs—not that it drops." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1127 (2026). And that's true here. Faced with such uncertainty about what the statute prohibits, Coloradans who dissent from the government's view on gender identity must choose between staying silent and risking potentially ruinous sanctions. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 625–26 (2021) (Gorsuch, J., concurring) (describing the "nine-year odyssey" of the Colorado baker who officials targeted out of hostility to his views on gender and sexuality).

Silence, however, only furthers the ideological conformity that the First Amendment protects against. It would mean that the only

---

[2] As explained by the appellant, Colorado misinterprets its own law. *See* Appellant's Br. at 36–38.

11

pronouns (or other gendered language) that people hear come from those willing to express the government's preferred message. And hearing the word "he" to describe a biological woman enough times, without objection or a contrary message, "will lead most to believe that the identified person is male." *Defending Educ.*, 158 F.4th at 760. For "[e]ven the truth has little chance unless a statement fits within the framework of beliefs that" people already hold. *Am. Booksellers Assoc. v. Hudnut*, 771 F.2d 323, 329 (7th Cir. 1985). And that's crucial for a political movement that depends on people accepting without reservation that one's gender is whatever they say it is. *See* Goldis, *supra*, at 3:18–5:30.

If the plaintiff lacks standing here, it—and every Coloradan who shares its beliefs—must remain in limbo, unsure of the circumstances in which using biologically correct pronouns might subject it to penalty.

That limbo will lead to silence. And that silence will allow the government to "enforce[e]" social change "through its control of language." *Defending Educ.*, 158 F.4th at 760. Neither Article III nor the First Amendment requires surrendering such freedom.

CONCLUSION

The Court should reverse the decision below.

June 15, 2026            Respectfully submitted by,

                         /s/ Brett R. Nolan
                         Alan Gura
                         Brett R. Nolan
                         INSTITUTE FOR FREE SPEECH
                         1150 Connecticut Ave., N.W.,
                         Suite 801
                         Washington, DC 20036
                         202-301-3300
                         bnolan@ifs.org
                         *Counsel for amicus curiae*

**CERTIFICATE OF COMPLIANCE**

I certify the following:

This brief complies with the type-volume limitation in Fed. R. App. 29(a)(5) because it contains 2,251 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 10th Cir. R. 32(A), as well as the type-style requirements of Fed. R. App. 32(a)(6) because it has been prepared in a proportionally spaced Serif typeface, Century Schoolbook, in 14-point font using Microsoft Word.

All required privacy redactions have been made under 10th Cir. R. 25.5.

The digital submission of this motion has been scanned for viruses with the most recent version of a commercial virus scanning program, and it is free of viruses.

/s/ Brett R. Nolan

14

## CERTIFICATE OF SERVICE

I hereby certify that all other parties to this litigation are represented by attorneys or have consented to electronic service in this case.

Dated: June 15, 2026

/s/ Brett R. Nolan