**Nos.26-1101, 26-1103, 26-1104**

**United States Court of Appeals for the Tenth Circuit**

*Defending Education*, *XX-XY Athletics*, and *Born Again UsedBooks*,
*Plaintiffs-Appellants,*

— v. —

*Aubrey C. Sullivan, Director Of The Colorado Civil Rights Division, In Her Official Capacity;Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S.Ward, Jade Rose Kelly, and Eric Artis, as members of The Colorado Civil Rights Commission, In Their Official Capacities; and Phil Weiser, Colorado Attorney General, in his official capacity, and State of Colorado, Defendants-Appellees*

ON APPEAL FROM THE ORDERS DATED MARCH 31, 2026 OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO, NO.

BRIEF OF AMICUS CURIAE WOMEN'S LIBERATION FRONT IN SUPPORT OF PLAINTIFFS-APPELLANTS

Lauren A. Bone, Legal Director
Elspeth Cypher, Board President
Women's Liberation Front
1930 18th Street NW, Suite B2, #2036
Washington, D.C. 20009
(202) 507-9475
legal@womensliberationfront.org

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus curiae states it is a non-profit 501(c)(3) organization. Amicus curiae has no corporate parent and is not owned in whole or in part by any publicly-held corporation.

i

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT..............................................i

TABLE OF AUTHORITIES.....................................................................v

INTRODUCTION AND INTEREST OF AMICUS CURIAE .................iii

ARGUMENT...........................................................................................1

CONCLUSION ........................................................................................8

INTRODUCTION AND INTEREST OF AMICUS CURIAE[1]

Amicus is the Women's Liberation Front ("WoLF"), a non-profit, radical feminist organization dedicated to the liberation of women by ending male violence, preserving woman-only spaces, abolishing sex stereotyping, and protecting reproductive sovereignty. WoLF's interest in this case stems from its interest in empowering and protecting the safety and privacy of women and girls and preserving women's sex-based civil rights.[2] The state of Colorado has enacted a law that requires the use of certain language and prohibits the use of other language. The Plaintiff-Appellees sought to enjoin the implementation of the law, and the District Court denied their motion. If the Court rules in favor of the Defendant-Appellee, it will strip the women in WoLF's organization of their Constitutional right to freedom of speech

---

[1] No counsel for any party authored any part of this brief, and no party, their counsel, or anyone other than WoLF, has made a monetary contribution intended to fund its preparation or submission.

[2] Amicus uses "sex" throughout to mean "the fundamental distinction, found in most species of animals and plants, based on the type of gametes produced by the individual," and the resulting classification of human beings into those two reproductive classes: female (women and girls) or male (men and boys). See Sex, Male, and Female, Miller-Keane Encyclopedia And Dictionary Of Medicine, Nursing, And Allied Health (7th ed. 2003), https://medical-dictionary.thefreedictionary.com.

and will move the country one step further toward abolishing sex and sex-based rights.

WoLF urges the Court to reverse the district court's decision to deny the Plaintiff-Appellant's motion for a preliminary injunction and thereby affirm the right of women to fully exercise their Constitutional rights and meaningfully participate in a society that maintains language that preserves the existence of sex in our discourse.

TABLE OF AUTHORITIES

Cases

*American Booksellers Association, Inc. v. Virginia* 802 F.2d 691, 694 (4th Cir. 1986), *aff'd on standing*, *Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) . . . . 2

*Bryant v. Woodall*, 1 F.4th 280 (2021) . . . . . . . . . . . . . . . . . . . . . 4, 5, 6

*Mobil Oil Corp. v. Att'y Gen. of Commonwealth of Va.*, 940 F.2d 73, 75 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Poe v. Ullman*, 367 U.S. 497, 502 (1961) . . . . . . . . . . . . . . . . . . . . . . . 5

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) . . . . . . . . . . . 2

*Whole Woman's Health v. Hellerstedt*, 579 U.S. 582 (2016) . . . . . . . . . 6

Other Authorities

Jeannie Baumann, *Abortion Restrictions Weakening Cancer Care, Other Treatments*, Bloomberg Law (Aug. 14, 2023),

https://news.bloomberglaw.com/pharma-and-life-sciences/abortion . . . 7

Lizzie Presser et al., *Texas Banned Abortion. Then Sepsis Rates Soared.*, ProPublica (Feb. 20, 2025),

https://www.propublica.org/article/texas-abortion-ban . . . . . . . . . . . . . 7

Kavitha Surana, *Afraid to Seek Care Amid Georgia's Abortion Ban, She Stayed at Home and Died*, ProPublica (Sept. 18, 2024),

https://www.propublica.org/article/candi-miller-abortion-ban-death . . 7

*Texas woman describes ordeal with state abortion law after miscarriage*, PBS News (Jul. 30, 2022), https://www.pbs.org/newshour/show . . . . . . 7

Jessica Valenti, *An American Nightmare: Young, pregnant & living in Texas*, Abortion, Every Day (Jun. 12, 2023),

https://jessica.substack.com/p/an-american-nightmare. . . . . . . . . . . . . 7

Jessica Valenti, *Her Fetus Has No Heartbeat–They Still Won't Give Her An Abortion*, Abortion, Every Day (Apr. 2, 2025),

https://jessica.substack.com/p/her-fetus-has-no-heartbeatthey-still . . . 7

Jessica Valenti and Kylie Cheung, *Illinois Woman Denied Treatment for Ectopic Pregnancy*, Abortion, Every Day (Oct 14, 2025),

[https://jessica.substack.com/p/illinois-woman-treatment-for](https://jessica.substack.com/p/illinois-woman-treatment-for) . . . . . . . . 7

ARGUMENT

## I. The District Court Misapplied the Injury-in-Fact Requirement by Not Recognizing Plaintiffs' Standing.

The district court's ruling that Plaintiffs lack pre-enforcement standing to challenge the Colorado Anti-Discrimination Act (CADA) because no enforcement action has yet been brought against them misapplies the injury-in-fact requirement. If adopted broadly, the district court's ruling would foreclose constitutional challenges to statutes that cause present, concrete harm through their existence and applicability. Challenges to statutes restricting abortion and related healthcare would be curtailed, damaging the rights of providers and patients who cannot afford to wait for a case to be filed against them before seeking judicial relief.

The pre-enforcement standing doctrine is based on the principle that forced compliance with an unconstitutional statute is itself a cognizable injury. Plaintiffs do not need to wait for a criminal or civil lawsuit, or wait to suffer direct harm from an unconstitutional statute, in order to show that a statute causes them present harm. The harm is

the coercion itself. Denying pre-enforcement standing forces plaintiffs to choose between forgoing their constitutional rights and risking liability. The Supreme Court articulated this principle in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), holding that two factors are sufficient to establish pre-enforcement injury-in-fact: (1) the plaintiff intends to engage in conduct that is plausibly covered by the challenged statute; and (2) the threat of enforcement is credible and not remote. *See id.* at 158. Both prongs are satisfied here.

As to the first factor, CADA does not just restrict Plaintiffs' speech. It imposes affirmative, conduct-based obligations by mandating when and how Plaintiffs must provide access to their services. These obligations affect Plaintiffs' day-to-day operations, creating a highly plausible risk of CADA enforcement against them. As to the second factor, enforcement here is neither remote nor speculative. The statute is active and enforceable, creating exactly the kind of credible threat the doctrine recognizes. A plaintiff faces a credible threat of enforcement as long as the threat is not imaginary or wholly speculative. *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979). Nothing in

the record suggests that the threat facing Plaintiffs falls into those categories.

Public policy reinforces this conclusion. Requiring plaintiffs to violate a statute in order to challenge it creates perverse incentives. As the Fourth Circuit recognized, "[p]ublic policy should encourage a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power, all while complying with the challenged law, rather than to deliberately break the law and take his chances in the ensuing suit or prosecution." *Mobil Oil Corp. v. Att'y Gen. of Commonwealth of Va.*, 940 F.2d 73, 75 (4th Cir. 1991). By inverting this principle, the District Court's holding upholds unconstitutional legislation by punishing those who exercise their right to challenge it.

## II. The District Court's Reasoning, If Adopted Broadly, Would Undermine Pre-Enforcement Standing in the Abortion Context and Beyond.

The logic underlying the court's holding - that the absence of an enforcement action defeats standing - would severely curtail the

ability of abortion providers and their patients to mount pre-enforcement challenges to restrictions on abortion and related healthcare. That result would be inconsistent with precedent and would expose women to serious, lethal harm.

In *Bryant v. Woodall*, 1 F.4th 280 (2021), the Fourth Circuit held that abortion providers had pre-enforcement standing to challenge North Carolina's criminal abortion statutes, even though the state had not prosecuted any providers under those statutes in almost fifty years. If decades of non-enforcement was insufficient to defeat standing in *Bryant*, the far shorter enforcement gap in this case cannot reasonably be found to do so here. The district court's contrary conclusion is difficult to reconcile with that holding. Notably, the *Bryant* court examined the history of non-enforcement and found that two specific factors supported standing. First, there was no evidence of open, notorious violations that the state had tacitly tolerated; the plaintiffs had continuously complied with the challenged statutes. *See Bryant*, 1 F.4th at 286. Second, recent legislative amendments to the statutes suggested a renewed interest in enforcement, undercutting any argument that the laws were dormant. *Id.* at 287. Both factors

4

apply with equal force here. As to the first, there is no record of Plaintiffs openly or notoriously flouting CADA. Courts have been clear that violations must be genuinely open and notorious before a history of non-enforcement can be said to cancel out standing, and nothing in this record meets that threshold. *See Poe v. Ullman*, 367 U.S. 497, 502 (1961). As to the second factor, CADA is considerably more recent than the North Carolina abortion laws at issue in *Bryant*, making the inference of continued legislative interest in enforcement even stronger in this case.

The Fourth Circuit in *Bryant* also considered the broader political and cultural salience of abortion, reasoning that because abortion was a subject of active debate, it was unlikely that the state's enforcement interest was nonexistent. Statutory amendments have received the same treatment. *See, e.g., American Booksellers Association, Inc. v. Virginia* 802 F.2d 691, 694 (4th Cir. 1986), *aff'd on standing, Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988) ("it would be unreasonable to assume that the General Assembly adopted the 1985 amendment without intending that it be enforced.")

Ultimately, parties should never be forced to choose between openly defying a law and, simply by complying with it, forfeiting their constitutional right to challenge it. Yet that is precisely the choice the district court's reasoning imposes. The consequences of that reasoning are especially stark in the abortion context. Courts have often recognized pre-enforcement standing for providers challenging abortion-related statutes on the grounds that a statute's existence - without prosecution - forces them to choose between withholding protected medical care and incurring criminal or civil liability. *See Whole Woman's Health v. Hellerstedt*, 579 U.S. 582 (2016); *Bryant*, 1 F.4th at 286–88. The district court's holding cannot be reconciled with those decisions.

Abortion-related healthcare is not a peripheral concern here. Statutes regulating abortion are often interpreted very strictly, and the consequences of interpretation fall directly on women. Women experiencing miscarriages have been denied necessary medical intervention by providers operating under fear of liability - not because a prosecution had been brought, but because the statute's existence was

enough to chill the provision of care.[3] That is precisely the kind of

present, concrete harm that pre-enforcement standing doctrine exists to

address. When providers cannot challenge an ambiguous or overbroad

statute until after enforcement, the chilling effect reaches every woman

whose healthcare needs fall near the boundary of what the statute

prohibits. In that environment, denying pre-enforcement standing does

not merely resolve a procedural question. It restricts providers and

---

[3] The chilling effect on women seeking to speak with medical personnel or attempting to obtain care is life threatening. One doctor says ideal treatment for patients with a severe fetal abnormality (like not developing a head) is "full spectrum pregnancy care—providing patients all the information they want in order to make a decision."One doctor says ideal treatment for patients with a severe fetal abnormality like not developing a head, " full spectrum pregnancy care—providing patients all the information they want in order to make a decision." See Full spectrum care. Being able to communicate freely about full spectrum  pregnancy care may be a matter of life and death for the woman. See e.g., Georgia woman died; obtaining medical help due to potential repercussions  Texas woman forced to carry dead fetus; South Carolina woman forced to carry dead fetus;  two women died from sepsis after denial of care; Over fifteen women have sued the state of Texas because of denial of care for life threatening pregnancies;  pregnant mother of five denied cancer treatment Even in states where abortion is legal a 28 year old woman with an ectopic pregnancy was denied care and had to search for another medical facility during the life threatening emergency.Illinois woman denied care.

patients' right to challenge laws that bear directly and profoundly on their lives, health, and autonomy.

CONCLUSION

WoLF urges the Court to consider the consequences of the severe chilling effect of the statute on the free speech of people of Colorado. WoLF supports the Plaintiffs-Appellants in seeking relief from these restrictions.

Respectfully submitted,

/s/ Lauren Adams Bone

Lauren Adams Bone,

Legal Director Women's Liberation Front 1930 18th St NW Ste B2 PMB #2036

Washington DC 20009 (202) 507-9475
Legaldirector@womensliberationfront.org

Counsel for Amicus Curiae

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Tenth Circuit because this brief contains 1654 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). 2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: June 6, 2025      Respectfully submitted,

/s/ Lauren Adams Bone

Lauren Adams Bone,

Legal Director Women's Liberation Front