Appeal No. 26-1103

# In the United States Court of Appeals for the Tenth Circuit

COMMITTEE OF FIVE, INC., D/B/A XX-XY ATHLETICS,
*Plaintiff-Appellant,*

v.

AUBREY C. SULLIVAN, in her official capacity as Director of the Colorado Civil Rights Division; SERGIO RAUDEL CORDOVA, GETA ASFAW, MAYUKO FIEWEGER, DANIEL S. WARD, JADE ROSE KELLY, AND ERIC ARTIS, in their official capacities as members of the Colorado Civil Rights Commission; PHIL WEISER, in his official capacity as Colorado Attorney General,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Colorado
Case No. 1:25-cv-01668 / Hon. Regina M. Rodriguez

BRIEF OF AMICUS CURIAE THE CENTER FOR AMERICAN LIBERTY
IN SUPPORT OF APPELLANT AND REVERSAL

Josh Dixon
Courtney Corbello
Center for American Liberty
2145 14th Avenue, Suite 8
Vero Beach, FL 32960
(703) 687-6212
jdixon@libertycenter.org
ccorbello@libertycenter.org
*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................ii

CORPORATE DISCLOSURE STATEMENT ......................................1

STATEMENT OF INTEREST ..............................................................2

FRAP 29(a)(2) STATEMENT ...........................................................4

FRAP 29(a)(4)(E) STATEMENT .......................................................5

INTRODUCTION ...............................................................................6

SUMMARY OF THE ARGUMENT .......................................................6

ARGUMENT......................................................................................9

    I.    A DISCRETIONARY ENFORCEMENT REGIME CHILLS SPEECH
WHEN OFFICIALS RESERVE POWER TO PUNISH AFTER THE FACT ..........9

        A. Speakers need not trigger enforcement before challenging
a speech-restrictive regime .......................................................10

        B. Colorado's "fact-specific" enforcement theory magnifies
the chill rather than dispelling it................................................13

    II.    THIS COURT SHOULD REJECT COLORADO'S ATTEMPT TO
TRANSFORM PUBLIC-ACCOMMODATION LAW INTO COMPELLED
ORTHODOXY ......................................................................................17

        A. Public-accommodation laws protect equal access to goods
and services, not compelled ideological affirmation ..............18

        B. Colorado's theory has no limiting principle and would
authorize viewpoint control far beyond this case ...................23

CONCLUSION .................................................................................28

i

**Cases**

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023) ...................................................................20, 21, 22

*Antonucci v. Winter*,
   No. 25-514 (2nd Cir. Mar. 4, 2025) ...............................................................2

*Chiles v. Salazar*,
   116 F.4th 1178 (10th Cir. 2024) ...................................................................11

*Chiles v. Salazar*,
   146 S. Ct. 1010 (2026) ...........................................................................11, 12

*Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*,
   158 F.4th 732 (6th Cir. 2025) .......................................................................21

*Doe v. Weiser*,
   No. 1:24-CV-2185-CNS-SBP, 2025 WL 295015
   (D. Colo. Jan. 24, 2025) ...........................................................................2, 23

*Doe v. Weiser*,
   No. 25-1037 (10th Cir. Jan. 31, 2025) ......................................................2, 23

*Dubash v. City of Houston*,
   Case No. 24-20485 (5th Cir. 2025) ................................................................2

*Forsyth Cnty. v. Nat'list Movement*,
   505 U.S. 123 (1992) ......................................................................................14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995) ................................................................................19, 21

*Iancu v. Brunetti*,
   588 U.S. 388 (2019) ......................................................................................25

*L.M. v. Town of Middleborough*,
   103 F.4th 854 (1st Cir. 2024) .........................................................................2

*Mahoney v. U.S. Cap. Police Bd.*,
   No. 21-2314 (JEB), 2024 WL 4235429 (D.D.C. July 31, 2024) ....................2

*Mahoney v. U.S. Cap. Police Bd.*,
   No. 24-5207 (D.C. Cir. Sept. 13, 2024) .........................................................2

*Matal v. Tam*,
   582 U.S. 218 (2017) ................................................................................25, 27

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ....................................................................2

*Peck v. McCann*,
43 F.4th 1116 (10th Cir. 2022) ...............................................11

*Police Dep't of City of Chi. v. Mosley*,
408 U.S. 92 (1972) ...................................................................23

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ..........................................................24, 25

*Regino v. Staley*,
133 F.4th 951 (9th Cir. 2025) ...................................................2

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ................................................................24

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006) ......................................................19, 20, 21

*Scott v. Allen*,
153 F.4th 1088 (10th Cir. 2025) .......................................15, 16

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
467 U.S. 947 (1984) ..................................................................9

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ......................10, 11, 12, 13, 15, 17

*Texas v. Johnson*,
491 U.S. 397 (1989) ................................................................14

*Villareal v. Alaniz*,
145 S. Ct. 368 (2024) ................................................................2

*Virginia v. American Booksellers Association*,
484 U.S. 383 (1988) ................................................................11

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ................................................................22

*Westar Energy, Inc. v. Lake*,
552 F.3d 1215 (10th Cir. 2009) ..............................................17

**Statutes**

Colo. Rev. Stat. § 24-34-301(9) ...........................................9, 21

Colo. Rev. Stat. § 24-34-601 ...............................................20, 24

Colo. Rev. Stat. § 24-34-601(2)(a) ............................................................................25

**Other Authorities**

Lauren J. Rosenblum, *Equal Access or Free Speech: The Constitutionality of Public Accommodations Laws*, 72 N.Y.U. L. Rev. 1243 (1997) ........................18

**Rules**

Fed. R. App. P. 29(a)(2) ..............................................................................................4

Fed. R. App. P. 29(a)(4)(E)..........................................................................................5

## CORPORATE DISCLOSURE STATEMENT

The Center for American Liberty (CAL) is a non-profit corporation with no parent companies, subsidiaries, or affiliates.

CAL is a 501(c)(3) non-profit law firm dedicated to protecting free speech and civil liberties. CAL has represented litigants across the country, including in this Court, in cases seeking to vindicate individuals' religious freedom, free speech, and parental rights, among other things, against oppressive government action. *See, e.g., Mahoney v. U.S. Cap. Police Bd.*, No. 21-2314 (JEB), 2024 WL 4235429 (D.D.C. July 31, 2024), *appeal docketed* No. 24-5207 (D.C. Cir. Sept. 13, 2024); *Regino v. Staley*, 133 F.4th 951 (9th Cir. 2025); *Doe v. Weiser*, No. 1:24-CV-2185-CNS-SBP, 2025 WL 295015 (D. Colo. Jan. 24, 2025), *appeal docketed* No. 25-1037 (10th Cir. Jan. 31, 2025). CAL has also filed multiple amicus briefs in the Supreme Court and other circuit courts on important First Amendment issues. *See, e.g., Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) (Brief of Amicus Curiae in Support of Petitioners); *Villareal v. Alaniz*, 145 S. Ct. 368 (2024) (Brief of Amicus Curiae in Support of Petitioner); *Dubash v. City of Houston*, Case No. 24-20485 (5th Cir. 2025) (Brief of Amicus Curiae in Support of Appellants); *L.M. v. Town of Middleborough*, 103 F.4th 854 (1st Cir. 2024) (Brief of Amicus Curiae in Support of Appellant).

CAL submits this brief to give this Court additional perspective on pre-enforcement standing analysis and the constitutional limits that govern public-accommodation laws when those laws are applied to speech. CAL agrees that states

generally may protect equal access to goods and services. But public-accommodation laws may not be transformed into tools for compelling ideological conformity, chilling dissenting speech, or allowing officials to decide which side of a public debate may speak freely. Because this case implicates those core First Amendment concerns, CAL respectfully submits this brief in support of Appellant and reversal.

## FRAP 29(a)(2) STATEMENT

Pursuant to Fed. R. App. P. 29(a)(2), counsel for amicus curiae sought consent from all parties regarding the filing of this amicus brief. Appellant consented to the filing, and Appellees have stated they take no position.

## FRAP 29(a)(4)(E) STATEMENT

No party or party's counsel has authored this brief either in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

**INTRODUCTION**

Colorado may require businesses open to the public to serve everyone. It may not require them to say what the State wants said. The district court allowed Colorado to duck that constitutional obligation by treating the State's enforcement discretion as a bar to Appellant's pre-enforcement challenge. In the First Amendment context, that gets the problem backwards. When officials refuse to disavow enforcement and instead reserve power to decide later whether speech is unlawful, speakers have not received a reprieve from prosecution. They've received a warning.

CAL submits this brief to address the constitutional boundary at the center of that warning. Public-accommodation laws prevent exclusion from the marketplace; they do not give officials power to script private speech on contested questions of sex and gender. Colorado has taken a law meant to guarantee access and turned it into a tool for policing language. Under the State's theory, speakers who use biologically accurate words may be investigated, pressured, and punished if those words are later deemed unwelcome or inconsistent with another person's chosen identity. The First Amendment does not tolerate that system. If the district court's order stands, other officials will have a roadmap for turning equal-access laws into tools of speech control. To prevent that, this Court should reinforce the rule that equal access may be required, but official orthodoxy may not.

The district court's order permits Colorado to blur a line that the First Amendment keeps sharp. Public-accommodation laws may ensure that businesses open to the public serve customers on equal terms. But they may not be transformed into speech codes that prescribe the words private speakers must use on disputed questions of sex and gender. CAL submits this brief to help the Court preserve that boundary: equal access may be protected, but official orthodoxy may not be compelled.

First, the district court erred by treating Colorado's discretionary enforcement position as reassurance rather than as a source of First Amendment injury. Appellant need not wait for a complaint, investigation, administrative proceeding, or penalty before seeking judicial review. Colorado has not disavowed enforcement; it has instead reserved authority to decide, after the fact and based on a future complainant's reaction, whether biologically accurate language violates the Colorado Anti-Discrimination Act ("CADA"). That uncertainty chills speech now. Under settled pre-enforcement doctrine, speakers facing a credible threat of enforcement may challenge a speech-restrictive regime before the process itself coerces silence or conformity.

Second, by ending its analysis at standing, the district court failed to confront the First Amendment boundary between equal access and compelled orthodoxy.

Public-accommodation laws protect equal access to goods and services; they do not authorize the government to compel ideological affirmation. Colorado may require businesses, medical offices, event hosts, and other public accommodations to serve customers, patients, and attendees on equal terms. But it may not require private speakers to adopt the State's preferred vocabulary on contested questions of sex and gender. By defining "gender expression" to include chosen names and how an individual chooses to be addressed—and then incorporating that definition into CADA's public-accommodation and publication provisions—Colorado crossed the constitutional line between regulating access and compelling speech.

That error matters beyond this case. If public-accommodation law can be used to compel preferred language whenever officials conclude that dissenting speech makes listeners feel unwelcome or disrespected, then the same logic can be used across all commerce, education, medicine, religion, advocacy, and other areas of public debate. The First Amendment requires a neutral rule: Colorado may prohibit actual refusals to serve and unequal treatment in places of public accommodation, but it may not use civil-rights law to choose the winning side of a contested public debate or compel private speakers to affirm the State's preferred view. States may regulate access, but they may not compel speech meant to convey ideological fealty.

## I. A DISCRETIONARY ENFORCEMENT REGIME CHILLS SPEECH WHEN OFFICIALS RESERVE POWER TO PUNISH AFTER THE FACT

The district court treated Colorado's discretion to initiate an enforcement action under CADA as reassurance that there was no credible threat of enforcement. 4.App.1030–4.App.1032. That gets things backwards. In the First Amendment context, discretion is often the source of the constitutional injury. *See, e.g., Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 964 n.12 (1984) (recognizing that a licensing scheme granting discretion to an official "creates a threat of censorship that by its very existence chills free speech"). Speakers do not self-censor only when the government promises inevitable punishment. They also self-censor when the government refuses to say whether their speech is lawful, reserves authority to decide later, and conditions that decision on a fact-intensive enforcement process triggered by offended listeners.

That is what Colorado has done here. It has amended CADA to make "chosen name" and "how the individual chooses to be addressed" part of "gender expression" and has prohibited discrimination on that basis. Colo. Rev. Stat. § 24-34-301(9); 1.App.124–25. It has refused to disavow enforcement against speakers who decline to use chosen names or preferred forms of address. *See* 3.App.0602–3.App.0603. And it has insisted that whether such speech violates CADA depends on the circumstances of a future complaint. *Id*. That is not a safe harbor but a warning.

Speakers may proceed only if they are willing to risk investigation, administrative process, compelled participation in enforcement proceedings, possible penalties, and the burden of litigating after the fact. The First Amendment does not require that gamble.

## A. Speakers need not trigger enforcement before challenging a speech-restrictive regime.

Pre-enforcement review exists because the Constitution does not require speakers to violate the law, invite punishment, and then assert their rights defensively. The Supreme Court has repeatedly recognized that speakers may seek judicial review before enforcement when they intend to engage in protected expression that is arguably proscribed by law and face a credible threat of enforcement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159–61 (2014) ("*SBA List*"). That rule is especially important in First Amendment cases because chilled speech often disappears silently. When speakers reasonably fear enforcement, they may never speak at all.

That is why the credible-threat inquiry must not be an insurmountable barrier. In *SBA List*, the Supreme Court concluded that standing existed where the plaintiffs intended to engage in future speech and thus faced a credible threat that Ohio's false-statement law would be enforced against them. *Id*. at 161–67. The Court did not require the plaintiffs to await a final adjudication or penalty. *Id*. at 158. Nor did it require certainty that enforcement would occur. *Id*. at 159. It was enough that the

threatened enforcement process placed the plaintiffs' intended speech under a credible cloud of legal risk. *Id*. The Supreme Court applied the same practical approach in *Virginia v. American Booksellers Association*, allowing booksellers to challenge a law regulating display of materials harmful to juveniles before any prosecution. 484 U.S. 383, 392–93 (1988).

This Court has likewise applied these principles with appropriate leniency in the First Amendment context. In *Peck v. McCann*, this Court explained that "the First Amendment context creates unique interests" that lead courts to apply standing requirements "somewhat more leniently" in pre-enforcement suits. 43 F.4th 1116, 1129 (10th Cir. 2022). The reason is straightforward: When speech is at stake, uncertainty about enforcement can itself produce injury. That is precisely why a speaker faced with a credible threat need not wait to bring suit until the State acts. *Id*. As this Court explained, "the 'credible threat' prong . . . is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context." *Id.* at 1133.

*Chiles v. Salazar* confirms the same point. There, this Court concluded the plaintiff had standing in a pre-enforcement First Amendment challenge to a Colorado law restricting certain counseling speech. 116 F.4th 1178, 1198–99 (10th Cir. 2024), *rev'd and remanded on other grounds*, 146 S. Ct. 1010 (2026). The Supreme Court did not disturb that conclusion. To the contrary, it agreed standing

existed. *Chiles v. Salazar*, 146 S. Ct. 1010, 1019 n.* (2026). And in reaching the merits, the Supreme Court reaffirmed the First Amendment's role as a bulwark against laws that impose an official orthodoxy on disputed questions. *Id*. at 1029.

The same rule applies here. Appellant seeks to continue speaking in biologically accurate terms about sex and gender while serving all customers. That is plainly protected expression. And Colorado has not disavowed enforcement. To the contrary, it has preserved that threat by insisting that enforcement will depend on the circumstances of a future complaint. 3.App.0602–3.App.0603 (Appellees' interrogatory response that "a place of public accommodation's refusal to use a customer's preferred pronouns or chosen name may" violate CADA). The First Amendment does not require speakers to become enforcement targets before asking whether the Constitution protects their speech.

Nor is the injury limited to final sanctions. Instead, the enforcement action itself gives rise to harm. In *SBA List*, the Supreme Court recognized that the burdens of an "administrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review." 573 U.S. at 165–67. That harm is clear here, where a complaint may trigger investigation, compulsory proceedings, reputational costs, legal expenses, and—consequently—pressure to conform speech to the State's preferred terminology. A speaker who must endure that process before obtaining judicial review has already surrendered his First Amendment freedom.

Pre-enforcement review exists to prevent that surrender, and to ensure that speakers may test the legality of a speech-restrictive regime before the threat of investigation, punishment, or coerced conformity accomplishes what the First Amendment forbids.

**B. Colorado's "fact-specific" enforcement theory magnifies the chill rather than dispelling it**

Colorado's principal response to the standing inquiry is that use of biologically accurate language does not automatically violate CADA. But that response does not solve the problem; it illustrates it. A speaker is still at risk when the government says only that speech is not unlawful "per se," while reserving authority to punish the same speech if officials later decide that the full context made it discriminatory, harassing, unwelcome, objectionable, unacceptable, or undesirable.

That kind of discretionary regime chills speech precisely because the line is unclear. Speakers must predict how future complainants, investigators, commissioners, administrative law judges, and courts will characterize the same words after the fact. They must account not only for what they intend to say, but for how a listener may subjectively experience the speech and how the State may later evaluate that experience under a flexible standard. That is exactly why pre-enforcement review is necessary. *See SBA List*, 573 U.S. at 164–66 (finding a credible threat of enforcement where future complaints were possible, and the "threat of Commission proceedings" itself imposed a cognizable burden on speech).

The danger is especially acute where the challenged law turns on listener reaction. The First Amendment does not permit the State to place speech at the mercy of whether listeners find it offensive or unwelcome. *See, e.g., Texas v. Johnson*, 491 U.S. 397, 408–09 (1989) (explaining that a "function of free speech under our system of government is to invite dispute") (citation omitted). Speech on contested public questions often causes offense. Much important speech does. But the Constitution does not allow government officials to convert offense into a licensing standard for public expression. If speech may be punished whenever a listener claims it made him feel unwelcome, unacceptable, or disrespected, then controversial speakers will rationally self-censor. *See, e.g., Forsyth Cnty. v. Nat'list Movement*, 505 U.S. 123, 134–35 (1992) ("Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob.").

Colorado's position invites exactly that result. Speakers who hold traditional views on sex and gender must decide whether to use the words they believe are true or instead adopt the State's preferred vocabulary to avoid legal risk. That pressure is a First Amendment burden. It tells speakers that they may continue participating in public life only if they moderate their language, soften their message, or refrain from speaking on the disputed issue altogether.

Being forced into this no-win situation has many concrete consequences. A speaker considering whether to publish a statement, host an event, train employees,

14

interact with customers, post on social media, or discuss public controversies must account for the possibility that a complaint will be filed and that the State will later deem the speaker's words unlawful. Even if the speaker ultimately prevails, the process imposes costs. The investigation is a burden. The need to retain counsel is a burden. The pressure to conciliate or mediate is a burden. The reputational damage of being accused of unlawful discrimination is a burden. And the ongoing threat of penalties is a burden. For many speakers, those burdens will be enough to compel silence.

This Court recently recognized as much in *Scott v. Allen*. There, the plaintiff wanted to publish information criticizing a Colorado state trooper but refrained because he feared prosecution under a law restricting publication of personal information about protected persons. 153 F.4th 1088, 1090–91 (10th Cir. 2025). The district court held that the plaintiff lacked standing because he had not shown that his intended conduct satisfied every element of the statute. *Id*. at 1093. This Court reversed. It explained that "[n]othing in [the Supreme] Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Id.* at 1095 (quoting *SBA List*, 573 U.S. at 163). It added that, because of the burdens the law placed on speech, the plaintiff "need not show that his intended conduct actually violates the law, just that it *arguably* does." *Id*. at 1096 (emphasis in original). And that showing is "not supposed to be a difficult bar"

in the pre-enforcement First Amendment context. *Id.* The Court also emphasized that the district attorney's refusal to disavow future prosecution supported standing. *Id*. at 1097.

The same reasoning applies here. Appellant need not prove that Colorado will ultimately conclude its speech violates CADA. It is enough that Colorado's enforcement position leaves its intended speech *arguably* proscribed and subject to a credible threat of future enforcement.

The district court thus erred in treating Colorado's "not per se" position as functionally equivalent to disavowal. 4.App.1031. A disavowal removes the threat. Colorado's position preserves it. The State has not said that Appellant's intended speech is protected. It has not said that refusal to use chosen names or preferred pronouns will never violate CADA absent denial of goods or services. It has not said that biologically accurate language cannot create a hostile or discriminatory environment under the Act. It has not said that there was no possibility of prosecuting Appellant in the future. It has said only that enforcement will depend on the circumstances.

That is not enough. A speaker should not be required to conduct constitutional risk analysis every time he uses a pronoun, honorific, name, or sex-based term. Nor should speakers have to wait for an offended listener to file a complaint before they

can obtain judicial review. When the State reserves the power to decide later whether speech is unlawful, it chills speech now.

In sum, Colorado's enforcement theory turns pre-enforcement doctrine upside down. The State asks speakers to trust that officials may not punish them, while refusing to provide assurance that their speech is lawful. That is not how First Amendment standing doctrine works. Speakers need not bet their businesses, reputations, livelihoods, or constitutional rights on the hope that officials will exercise discretion benevolently in the future. Because Colorado's discretionary regime burdens speech before enforcement occurs, this Court should hold that Appellant faces a credible threat sufficient to support pre-enforcement relief.

## II. THIS COURT SHOULD REJECT COLORADO'S ATTEMPT TO TRANSFORM PUBLIC-ACCOMMODATION LAW INTO COMPELLED ORTHODOXY

Although the district court denied preliminary relief on standing grounds, the First Amendment merits remain relevant to this appeal. Pre-enforcement standing requires courts to ask whether the plaintiff intends to engage in conduct arguably protected by the Constitution and arguably proscribed by the challenged law. *SBA List*, 573 U.S. at 159–61. And if this Court concludes that Appellant has standing, it may consider the likelihood of success on the merits in determining the appropriate preliminary relief. *See, e.g., Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009) ("If the district court fails to analyze the factors necessary to justify a preliminary injunction, this court may do so if the record is sufficiently developed.").

CAL therefore addresses that question too.

### A. Public-accommodation laws protect equal access to goods and services, not compelled ideological affirmation.

This case sits at the intersection of two principles that can and must coexist. States may enact public-accommodation laws to ensure equal access to goods and services. But the First Amendment forbids the government from compelling private speakers to express messages they do not believe. The district court's order allows Colorado to collapse that distinction. Under CADA, Colorado treats disagreement over contested language as a denial of public accommodation and then uses that premise to regulate speech about one of the most disputed moral, scientific, religious, and political questions of our time.

That is not what public-accommodation law is for. A public-accommodation law may require a retailer to sell the same product to all customers, a bookstore to make its inventory available on equal terms, a physician's office to provide medical services without status-based exclusion, or an event host to offer admission on the same terms. *See* Lauren J. Rosenblum, *Equal Access or Free Speech: The Constitutionality of Public Accommodations Laws*, 72 N.Y.U. L. Rev. 1243, 1249–51 (1997) (noting that public-accommodations statutes were enacted to ensure equal access to goods and services and to prevent discrimination by private individuals who control them). But while the Supreme Court has repeatedly recognized that public-accommodation laws serve the important purpose of removing exclusionary

practices from public life, it has also repeatedly made clear that when those laws are used to compel expression, the First Amendment must prevail.

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) is one example. There, the Supreme Court held that Massachusetts could not apply its public-accommodation law to force parade organizers to include a group whose message they did not wish to convey. *Id*. at 561–63. The Court did not question the general validity of public-accommodation laws. *See id.* To the contrary, it acknowledged that such laws serve legitimate ends by ensuring equal access to publicly available goods, privileges, and services. *Id*. at 571–72.

But the Court drew a constitutional line. Public-accommodation laws may remove barriers to participation in commercial life; they may not be applied "to expressive activity" in a way that alters a speaker's message. *Id*. at 578. The government could not require the parade organizers to "alter the expressive content of their parade" by including a message they did not wish to convey. *Id*. at 572–73. That principle controls here. Colorado may require public accommodations to provide equal access to goods and services, but it may not compel speakers to alter their message about sex and gender by requiring them to use chosen names, pronouns, titles, or other forms of address that communicate a view they reject.

The Supreme Court's line grew brighter with its decision in *Rumsfeld v. FAIR*, 547 U.S. 47 (2006). There, the Court upheld a federal law requiring law schools to

19

provide military recruiters with equal access to students. *Id*. at 70. The key was that the regulation governed conduct—equal access to recruiting services—rather than the schools' own message. *Id*. at 60, 64–65. Unlike *Hurley*, the law "neither limit[ed] what law schools may say nor requir[ed] them to say anything." *Id*. at 60. Colorado's application of CADA does the opposite. It does not merely require equal access to goods and services; it redefines refusal to use ideologically preferred language about gender as denial of "full and equal enjoyment," thereby turning an access regulation into a speech regulation. Colo. Rev. Stat. § 24-34-601.

More recently, in *303 Creative LLC v. Elenis*, the Supreme Court confirmed the point yet again—and in a case involving CADA. 600 U.S. 570 (2023). There, Colorado invoked CADA to compel a website designer to create custom expression celebrating same-sex weddings. *Id.* at 579–83. The Supreme Court held that Colorado could not force the designer to "speak as the State demands" or punish her for expressing her own beliefs. *Id*. at 589. The Court made clear that while it did "not question the vital role public accommodations laws play in realizing the civil rights of all Americans," it was also the case that "no public accommodations law is immune from the demands of the Constitution." *Id*. at 590, 592. When a public-accommodations law is "deployed to compel speech" in violation of the First Amendment, there is "no question [the Constitution] must prevail," regardless of whether the State believes the compelled message would advance equality or

inclusion. *Id*. at 591–92.

These cases mark the constitutional boundary Colorado crosses here. *Hurley* and *303 Creative* dictate that public-accommodation laws cannot be applied to compel a private speaker to alter the expressive content of its speech. *Rumsfeld* confirms that equal-access regulations may survive First Amendment challenge where they regulate conduct rather than speech and leave the speaker able to speak freely. Colorado's amended CADA expands the definition of "gender expression" to include an individual's "chosen name" and "how the individual chooses to be addressed." Colo. Rev. Stat. § 24-34-301(9). Thus, the State has converted a law guaranteeing equal enjoyment of goods and services into a speech code that regulates the words speakers may use when addressing or discussing persons who identify as transgender. That is a speech regulation, not an access regulation.

Colorado cannot avoid this conclusion by characterizing the words CADA compels as ordinary customer-service etiquette. Names, pronouns, honorifics, and sex-based terms are not empty sounds. They convey meaning. As the Sixth Circuit has explained, those with the view that "a person's immutable sex is determined at birth" are "convey[ing] a message consistent with these scientific beliefs when they use biological pronouns to refer to all individuals, including transgender or nonbinary individuals." *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 753 (6th Cir. 2025) (en banc) (cleaned up). In other words, one side

21

of the gender ideology debate requires the use of biologically accurate language to communicate the view that sex is real, binary, and immutable. The State may prefer the opposite viewpoint. But it may not force private speakers to adopt its preferred terminology as the price of participating in public life.

So too here. Colorado's preferred terminology communicates a contested message about sex and gender and compels Appellant, and others subject to CADA, to express that message. That compulsion is particularly troubling because the speech at issue concerns matters of public concern. Debates over sex, gender identity, women's sports, parental rights, medical care, and religious liberty are among the most contested issues in American public life. The First Amendment does not permit the State to resolve those debates by declaring one side's vocabulary discriminatory and the other side's vocabulary mandatory. As the Supreme Court has explained, "[i]f there is any fixed star in our constitutional constellation," it is that no official may "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

This problem cannot be cured by saying that speakers may avoid liability by biting their tongues. The First Amendment does not force citizens to choose between compelled speech and silence. *303 Creative*, 600 U.S. at 589. For many speakers, silence itself conveys the message. A company formed to advocate for women's

sports cannot communicate its advocacy while avoiding sex-based language. Physicians cannot fully explain their medical judgment when they must avoid terms necessary to describe biological sex. A religious bookstore cannot accurately enforce its policies if it must remain silent about the religious reasons for them. A parental rights organization cannot oppose parental secrecy policies in schools, *see, e.g., Doe v. Weiser*, No. 1:24-CV-2185-CNS-SBP, 2025 WL 295015 (D. Colo. Jan. 24, 2025), *appeal docketed* No. 25-1037 (10th Cir. Jan. 31, 2025), while avoiding the language that identifies what it opposes. The State cannot constitutionally say, "speak our words, or do not speak at all."

**B. Colorado's theory has no limiting principle and would authorize viewpoint control far beyond this case**

The district court's order should concern this Court not only because of its impact on Appellant, but because of how its effects may reverberate beyond this case. Colorado's theory has no limiting principle. If accepted, it would provide a ready blueprint for government actors to use public-accommodation laws to impose their own vocabulary whenever speech touches a protected trait.

The First Amendment does not allow constitutional protection to turn on whether the government approves of the speaker's view. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). That principle applies with special force when the

government singles out disfavored viewpoints. Viewpoint discrimination is "an egregious form of content discrimination," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), because it allows the State to "license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992).

Colorado's position creates precisely that danger. Speakers who affirm a person's chosen name, preferred pronouns, and asserted gender identity face no risk under CADA. Speakers who use biologically accurate language do. The dividing line is not access to goods or services. It is the viewpoint conveyed by the words used. One side's language is treated as respectful, affirming, and lawful; the other side's language is treated as potentially hostile, unwelcome, and discriminatory.

The defect in Colorado's approach is not limited to this case. It lies in the State's theory of what public-accommodation law may do. Colorado treats a speaker's use of language as a "privilege," "advantage," or "accommodation" that must be provided in the form the listener prefers. Colo. Rev. Stat. § 24-34-601. But that framing has no limiting principle. If the State can define "equal enjoyment" to include a right to chosen names and pronouns, then public-accommodation law becomes a mechanism for compelling ideological conformity of any kind whenever speech touches a protected trait. *Id*.

The government may not evade viewpoint-neutrality principles by recasting disfavored speech as offensive, harmful, or undignified. In *Matal v. Tam*, the Supreme Court unanimously struck down a federal trademark provision barring "disparaging" marks, holding that the government may not deny a benefit to speakers because their expression gives offense. 582 U.S. 218, 243 (2017). In *Iancu v. Brunetti*, the Court reached a similar conclusion about a bar on "immoral" or "scandalous" marks, concluding that the provision was facially viewpoint-discriminatory because it permitted registration of marks expressing conventional moral views while disallowing marks that defied them. 588 U.S. 388, 393–94 (2019). And in *R.A.V.*, the Court invalidated an ordinance that selectively prohibited fighting words when directed at persons on the basis of race, color, creed, religion, or gender—while leaving equally provocative fighting words on other subjects unregulated. 505 U.S. at 391–93. Justice Scalia's majority opinion established that, even within a category of regulable speech, the government may not impose restrictions that discriminate based on the speaker's viewpoint. *Id*. at 391.

That rule matters here because Colorado has made liability turn on the communicative effect of sex-based language. Under the State's theory, biologically accurate words may become actionable if officials later decide that those words made a listener feel unwelcome, objectionable, unacceptable, undesirable, or denied equal enjoyment. *See* Colo. Rev. Stat. § 24-34-601(2)(a). Once listener offense

25

becomes the trigger for public-accommodation liability, officials must decide which viewpoints are respectful enough to be allowed and which are offensive enough to be punished. That is the kind of judgment the First Amendment withholds from government.

That danger warrants correction now, before Colorado's theory becomes a template for using public-accommodation law to control speech far beyond this case. A state that favors a different orthodoxy could require businesses to use only biologically accurate pronouns, deeming contrary language misleading, offensive to women, or inconsistent with the dignity of sex-based spaces. A city could treat refusal to use religious titles or faith-based honorifics as making religious patrons feel unwelcome. A licensing regime could pressure counselors, doctors, bookstores, advocacy groups, or event organizers to adopt the State's preferred terminology on abortion, sexuality, race, religion, immigration, or national identity whenever officials conclude that contrary language denies equal enjoyment. Once public-accommodation law is untethered from access and tied instead to the perceived dignity effects of speech, the limiting principle disappears.

The answer cannot be that courts should trust today's officials to enforce the law only against speakers whose views deserve condemnation. The First Amendment was adopted to prevent government from making that judgment in the first place. As the Supreme Court explained in *Matal*, "[s]peech may not be banned

on the ground that it expresses ideas that offend." 582 U.S. at 223. That rule protects speakers across ideological lines because government power changes hands. The same mechanism used today to compel "progressive" terminology can be used tomorrow to compel "conservative," "nationalist," or "religious" terminology. A constitutional rule that depends on the current government's preferred vocabulary is no rule at all.

A neutral rule is both available and necessary. Colorado may enforce laws that require equal access to goods and services. It may prohibit actual refusals to serve, unequal terms of service, and discriminatory exclusion from places of public accommodation. But it may not compel ideological language, punish biologically accurate speech, or condition participation in public life on affirming the State's view of sex and gender. That distinction protects everyone. It preserves equal access while ensuring that the State may not use public-accommodation law to choose the winning side of a public debate.

This Court should reject Colorado's theory. Doing any less would greenlight more regimes in which officials define disagreement as discrimination and then use civil-rights enforcement to manage public discourse. The First Amendment requires a different rule: access may be regulated, but orthodoxy may not be compelled.

\* \* \*

27

Colorado has crossed the Supreme Court's carefully established line between equal access and speech compulsion, and the district court has permitted it to do so by refusing to analyze the merits in determining the appropriate preliminary relief. This Court should reverse and grant a preliminary injunction.

## CONCLUSION

This Court should reverse and direct the district court to enter the requested preliminary injunction on remand.

Dated: June 15, 2026

*s/Josh Dixon*
Josh Dixon
Courtney Corbello
Center for American Liberty
2145 14th Avenue, Suite 8
Vero Beach, FL 32960
(703) 687-6212
jdixon@libertycenter.org
ccorbello@libertycenter.org
*Counsel for Amicus Curiae*

28

**CERTIFICATE OF COMPLIANCE**

I certify that:

1.  This document complies with the word limit of Fed. R. App. P. 29(a)(4)(G) because, excluding the parts of the document exempted under Fed. R. App. P. 32(f), this document contains 5,567 words, as calculated by Microsoft Word and in compliance with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5); and

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in size 14-point Times New Roman, a proportionally spaced font, using Microsoft Word.

*s/Josh Dixon*
Josh Dixon
