Nos. 26-1101, 26-1103, 26-1104

═══════════════

## In the
## United States Court of Appeals
## for the Tenth Circuit

─────────────

DEFENDING EDUCATION, et al., *Plaintiffs-Appellants*,

v.

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity, et al., *Defendants-Appellees*.

─────────────

COMMITTEE OF FIVE, INC., D/B/A XX-XY ATHLETICS, *Plaintiff-Appellant*,

v.

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity, et al., *Defendants-Appellees*.

─────────────

DOXA ENTERPRISES, LTD. D/B/A BORN AGAIN USED BOOKS, *Plaintiff-Appellant*,

v.

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity, et al., *Defendants-Appellees*.

─────────────

**On Appeal from the United States District Court for the District of Colorado Case Nos. 25-cv-01572-RMR-MDB, 25-cv-01668-RMR-MDB, and 25-cv-02177-RMR-MDB**

─────────────

**Brief of *Amici Curiae* America's Future, Public Advocate of the United States, Public Advocate Foundation, Citizens United, Citizens United Foundation, Clare Boothe Luce Center for Conservative Women, One Nation Under God Foundation, Frontline Ministries, Inc., Restoring Liberty Action Committee, Conservative Legal Defense and Education Fund, and Fitzgerald Griffin Foundation in Support of Plaintiffs-Appellants and Reversal**

─────────────

JOSEPH W. MILLER
 LAW OFFICES OF JOSEPH MILLER, LLC
 Council Grove, KS

WILLIAM J. OLSON*
 JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.

Michael Boos
  Citizens United
  Washington, DC

Rick Boyer
  Integrity Law Firm
  Lynchburg, VA

370 Maple Avenue W., Suite 4
Vienna, VA  22180-5615
(703) 356-5070
wjo@mindspring.com
*Attorney of Record

*Attorneys for Amici Curiae*
June 15, 2026

# DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), it is hereby certified that the *Amici Curiae* America's Future, Public Advocate of the United States, Public Advocate Foundation, Citizens United, Citizens United Foundation, Clare Boothe Luce Center for Conservative Women, One Nation Under God Foundation, Frontline Ministries, Inc., Conservative Legal Defense and Education Fund, and Fitzgerald Griffin Foundation are non-stock, nonprofit corporations, have no parent companies, and no person or entity owns them or any part of them. Restoring Liberty Action Committee is an educational organization.

*/s/ William J. Olson*
William J. Olson
Attorney of Record for *Amici Curiae*

ii

# TABLE OF CONTENTS

Page

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT

I.     THE DISTRICT COURT ELEVATED ESTABLISHED STANDARDS FOR
       STANDING TO AVOID MAKING A RULING ON THE MERITS . . . . . . . . . 8

II.    COLORADO'S LEGISLATURE BRAZENLY EMPLOYS ITS POLICE
       POWERS TO CENSOR SPEECH AND IMPEDE THE FREE EXERCISE OF
       RELIGION . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III.   COLORADO'S LAW IS OUTSIDE THE TRADITION OF PUBLIC
       ACCOMMODATION AND ANTI-DISCRIMINATION LAWS . . . . . . . . . . . 17

       A.     The Law of Public Accommodations . . . . . . . . . . . . . 18

       B.     Laws Prohibiting Racial Discrimination . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

Page

**HOLY BIBLE**

*Acts* 10:45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Acts* 17:26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Romans* 2:11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

2 *Corinthians* 6:17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*James* 2:9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**U.S. CONSTITUTION**

Amendment I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 10, 18

**STATUTES**

Colo. Rev. Stat. § 24-34-301(9) . . . . . . . . . . . . . . . . . . . . . . . 17

Colo. Rev. Stat. § 24-34-600.3 . . . . . . . . . . . . . . . . . . . . 19, 20

Colo. Rev. Stat. § 24-34-601(2)(a) . . . . . . . . . . . . . . . . . . . . . 16

Colorado Anti-Discrimination Act . . . . . . . . . . . . . . . . . . . 2, *passim*

Civil Rights Act of 1964 . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

**CASES**

*303 Creative LLC v. Elenis,* 600 U.S. 570 (2023) . . . . . . . . . . . . . 4, 10, 13

*Bostock v. Clayton County*, 590 U.S. 644 (2020) . . . . . . . . . . . . 16, 21, 23

*Bowers v. Hardwick*, 478 U.S. 186 (1986) . . . . . . . . . . . . . . . . . . 16

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) . . . . . . . . . . . . . . . . 22

*Chiles v. Salazar*, 146 S. Ct. 1010 (2026) . . . . . . . . . . . . . . . . . . 13

*Cohens v. Virginia*, 19 U.S. 264 (1821) . . . . . . . . . . . . . . . . . . . 14

*DOC v. New York*, 588 U.S. 752 (2019) . . . . . . . . . . . . . . . . . . . 13

*Heart of Atlanta Motel v. United States*, 379 U.S. 241 (1964) . . . . . . . . . . 21

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp*., 515 U.S. 557 (1995) . . . 22

*Lawrence v. Texas*, 593 U.S. 558 (2003) . . . . . . . . . . . . . 6, 16, 23

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . 13, 20

*Obergefell v. Hodges*, 576 U.S. 644 (2015) . . . . . . . . . . . . 6, 7, 16, 23

*Olympus Spa v. Armstrong*, 169 F.4th 817 (9th Cir. 2026) . . . . . . . . . . 23, 24

*Peck v. McCann*, 43 F.4th 1116 (10th Cir. 2022) . . . . . . . . . . . . . . 12

*Romer v. Evans*, 517 U.S. 620 (1996) . . . . . . . . . . . . . . . . . 6, 7, 8, 16

*Scott v. Allen*, 153 F.4th 1088 (10th Cir. 2025) . . . . . . . . . . . . . . . 12

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) . . . . . . . . . . . . . . 13
*United States v. Carolene Products Co.*, 304 U.S. 144 (1938). . . . . . . . . . . 23
*United States v. Windsor*, 570 U.S. 744 (2013) . . . . . . . . . . . . . . . . . 6, 16

**MISCELLANEOUS**

Joseph Beale, Jr., The Law of Innkeepers and Hotels (William J. Nagel:
    1906) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19
W. Blackstone, Commentaries on the Laws of England . . . . . . . . . . . . . 6, 20
Dave Bohon, "Christian Businesses Targeted Over Refusal to Serve
    Gay Weddings," *The New American* (Aug. 26, 2013) . . . . . . . . . . . . 25
Malcolm M. Feeley, The Process is the Punishment: Handling Cases in a
    Lower Criminal Court (1979) . . . . . . . . . . . . . . . . . . . . . . . . . 9
Marte Gunderson, "Businesses can refuse service to anyone. Even Sen.
    Lora Reinbold," *Anchorage Daily News* (Nov. 19, 2020). . . . . . . . . . 19
Father Mark Hodges, "Christian couple loses business for refusing to
    participate in gay 'wedding'," *LifeSiteNews* (June 25, 2015) . . . . . . . . 25
"Justice Kennedy's Hidden Motivation Behind Same-Sex Marriage Ruling,"
    *Instinct Magazine* (Nov. 13, 2025) . . . . . . . . . . . . . . . . . . . . . . 6
Franz Kafka, The Trial (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
"NY photographer fights for freedom to create according to her beliefs,"
    *Alliance Defending Freedom* (Jan. 12, 2022) . . . . . . . . . . . . . . . . . 25
Richard Pierce, "Is Standing Law or Politics?," 77 N.C. L. Rev. 1741
    (June 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 15
Molly Prince, "Mike Lee Blocked EEOC Nominee Who Believes
    Sexual Liberty Trumps The First Amendment," *Daily Caller*
    (Dec. 20, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
John Sherry, The Laws of Innkeepers (Cornell Univ. Press: 1993) . . . . . . . . 19

# INTEREST OF *AMICI CURIAE*[1]

America's Future, Public Advocate of the United States, Public Advocate Foundation, Citizens United, Citizens United Foundation, Clare Boothe Luce Center for Conservative Women, One Nation Under God Foundation, Frontline Ministries, Inc. (and its Exodus Mandate Project), Conservative Legal Defense and Education Fund, and Fitzgerald Griffin Foundation are nonprofit organizations exempt from federal income tax under IRC sections 501(c)(3) or 501(c)(4), which work to defend constitutional rights and protect liberties. Restoring Liberty Action Committee is an educational organization. Some of these *amici* filed *amicus* briefs in the Supreme Court of Colorado and the U.S. Supreme Court in previous challenges to the same Act at issue here.

- *Masterpiece Cakeshop v. Craig and Mullins*, Colorado Supreme Court, No. 2015SC738, Brief *Amicus Curiae* of U.S. Justice Foundation, et al. (Oct. 23, 2015);
- *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, U.S. Supreme Court, No. 16-111, Brief *Amicus Curiae* of Public Advocate of the United States, et al. (Sept. 7, 2017);
- *303 Creative v. Elenis*, U.S. Supreme Court, No. 21-476, Brief *Amicus Curiae* of Public Advocate of the United States, et al. (Oct. 28, 2021); and

---

[1] Counsel for Appellants have consented to the filing of this brief *amicus curiae*; Counsel for Appellees in all cases have stated they "take no position." No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

- *303 Creative v. Elenis*, U.S. Supreme Court, No. 21-476, [Brief *Amicus Curiae* of Public Advocate of the United States, et al.](#) (June 2, 2022).

Some of these *amici* also filed an *amicus* brief on the merits in the U.S. Supreme Court in *Chiles v. Salazar*, No. 24-539, which was a challenge to Colorado's "Minor Therapy Conversion Law." *See* [Brief *Amicus Curiae* of America's Future, et al.](#) (June 13, 2025).

## STATEMENT OF THE CASE

This case involves three challenges, decided in a single opinion by the district court, to Colorado HB25-1312, which, in 2025, amended portions of the "Colorado Anti-Discrimination Act" ("CADA"): *Defending Education, et al. v. Sullivan, et al.*; *Committee of Five, Inc. v. Sullivan, et al.*; and *Doxa Enterprises, Ltd. v. Sullivan, et al. See Defending Educ. v. Sullivan*, 2026 U.S. Dist. LEXIS 70183 at *4 (D. Colo. 2026) ("*Defending Education*").

CADA, in relevant part, forbids places designated as "public accommodations" to:

> withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, **gender identity, gender expression**, marital status, national origin, or ancestry the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation … because of disability, race, creed, color,

sex, sexual orientation, **gender identity, gender expression**, marital status, national origin, or ancestry. [*Id*. at *6-7 (emphasis added).]

In May 2025, Colorado adopted HB25-1312, amending CADA as follows:

> [First, it] amends CADA's definition of "**gender expression**" to: "an individual's way of reflecting and expressing the individual's gender to the outside world, typically demonstrated through appearance, dress, behavior, **chosen name**, and how the individual chooses to be addressed...."
> It also amends "**chosen name**" to mean: "a name that an individual requests to be known as in connection to the individual's disability, race, creed, color, religion, sex, sexual orientation, gender identity, gender expression, marital status, familial status, national origin, or ancestry, so long as the name does not contain offensive language and the individual is not requesting the name for frivolous purposes...."
> And finally, "**gender identity**" is defined under CADA as: "an individual's innate sense of the individual's own gender, which may or may not correspond with the individual's sex assigned at birth."
> [*Id*. at *7-8 (emphasis added).]

Three challenges were brought against the law. *Defending Education* plaintiffs include "various non-profit organizations … two individuals … and [a] medical practice." *Id*. at *8. The *Committee of Five* plaintiff is "an athletic-apparel retailer called XX-XY Athletics ('XX-XY') with a distinct message and mission: 'to empower women and protect women's sports and women's spaces.'" *Id*. at *9. The *Doxa* plaintiff is a Christian bookstore, "Born Again Used Books." *Id*. at *10.

The plaintiffs sought a preliminary injunction against the amended CADA because they wished to be able to use pronouns that correspond to customers' biological sex and argued that the law would penalize them for so doing. The magistrate judge recommended that the injunction be denied, and the district court adopted that recommendation. The district court ruled that the plaintiffs lacked standing because they failed to "present a credible threat of enforcement" of CADA against them, since they did not intend to actually deny services to anyone. *Id.* at *12. The court credited the magistrate judge's determination that director Sullivan's unspecified "interpretation" of CADA "operates like a disavowal" of intent to punish plaintiffs simply for using biologically accurate pronouns. *Id.* at *16.

The district court further found that an injunction would alter the status quo rather than preserving it, since CADA had been "in place decades before" and certain Commission Rules have been in place since 2009. *Id.* at *20. Finally, the district court rejected plaintiffs' reliance on *303 Creative LLC v. Elenis,* 600 U.S. 570 (2023), that CADA's provision of a private right of action for individual customers to bring complaints to the Division creates a credible threat of enforcement against the plaintiffs. *Id.* at *32-33.

## STATEMENT

The central issue for this Court to address is whether the district court erred in being completely dismissive of the very real threat to Christian businesses presented by recent revisions to CADA which were designed to facilitate the targeting and harassing of such businesses by LGBTQ activists working together with government officials who share their agenda. For years, those in power in Colorado appear to have believed the First Amendment rights of Christian businesses did not deserve protection, as they ratchet up the pressure on Christian businesses, giving them the Hobson's choice of either sacrificing their religious beliefs and rights to freedom of speech, or being driven into bankruptcy.

By any standard, Colorado has been among the most aggressive in granting special rights to so-called "LGBTQ" persons by suppressing the First Amendment protections of speech and the free exercise of religion of others. Colorado's leadership role is ironic because just 30 years ago, Colorado voters passed Amendment 2, by a 53-to-47 percent margin, amending the Colorado state constitution to prohibit any state or local government entity from enacting any law that would give special rights based on sexual orientation. In response,

in an opinion written by Justice Kennedy,[2] the Supreme Court ruled that Amendment 2 violated the Equal Protection Clause. Only after he left the High Court did Justice Kennedy admit that his view of that clause had nothing to do with the original public meaning of the Equal Protection Clause:

> For me, the important and **perhaps deciding factor was the children**…. We were amazed to find that at first it looked like 75,000 children were adopted by gay parents…. These children were in states that did not allow gay marriage…. The stigma and the hardship on the children was a very important factor for those of us in the majority. ["Justice Kennedy's Hidden Motivation Behind Same-Sex Marriage Ruling," *Instinct Magazine* (Nov. 13, 2025) (emphasis added).][3]

By the time *Obergefell* was decided, Chief Justice Roberts exploded in his dissent, accusing Justice Kennedy of writing an opinion that has "nothing to do with" the Constitution:

---

[2] No other Justice did more than Kennedy to elevate the LGBTQ prerogatives over the rights of those embracing traditional Biblical Morality, writing the court's decisions in *Romer v. Evans*, 517 U.S. 620 (1996); *Lawrence v. Texas*, 593 U.S. 558 (2003); *United States v. Windsor*, 570 U.S. 744 (2013); and *Obergefell v. Hodges*, 576 U.S. 644 (2015).

[3] There was a time that such an admission would erode all confidence in the validity of such a decision. As Blackstone explained: "*Ex facto oritur jus*" (the law arises from the fact). If "the fact be perverted or misrepresented, the law which ariseth from thence will unavoidably be unjust or partial." W. Blackstone, III Commentaries on the Laws of England at *329-30.

> The majority's decision is **an act of will, not legal judgment**. The right it announces **has no basis in the Constitution or this Court's precedent**…. If you are among the many Americans — of whatever sexual orientation — who favor expanding same-sex marriage, by all means celebrate today's decision. Celebrate the achievement of a desired goal. Celebrate the opportunity for a new expression of commitment to a partner. Celebrate the availability of new benefits. **But do not celebrate the Constitution. It had nothing to do with it.** I respectfully dissent. [*Obergefell v. Hodges* at 687, 713 (Roberts, C.J., dissenting).]

In any event, these *amici* urge this court to address the specific reason

Justice Kennedy gave in his opinion for an earlier ruling under the Equal

Protection Clause:

> If the constitutional conception of "equal protection of the laws" means anything, it must at the very least mean that **a bare desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest**. [*Romer v. Evans*, 517 U.S. 620, 634 (1996) (bold added).]

Today, the shoe is on the other foot. This Court needs to consider whether the

district court's elevation of the standards for standing to obtain judicial protection

of the First Amendment rights of Christian businesses violates this principle

articulated by Justice Kennedy. In the view of these *amici*, Colorado's

increasing demands on Christian businesses and ratcheting up the sanctions to

which they are subject, constitutes "a bare desire to harm a politically unpopular

group" and thus, in the words of Justice Kennedy, "cannot constitute a *legitimate* governmental interest." *Id*.

## ARGUMENT

**I.     THE DISTRICT COURT ELEVATED ESTABLISHED STANDARDS FOR STANDING TO AVOID MAKING A RULING ON THE MERITS.**

If a law is enacted to punish certain speech, particularly when it constitutes viewpoint discrimination, and especially when connected to the free expression of religion, standing should not be an issue, and it really is not here. The grounds on which the magistrate judge based her denial of standing reveal the weakness of the court's ruling:

- Defendant [Director of the Colorado Civil Rights Division] Sullivan's interpretation of the subject CADA provisions, while not law, helps demonstrate that the mere act of speaking would not automatically trigger enforcement and that this operates like a disavowal [of enforcement].
- [T]he Colorado Civil Rights Division has not received any complaints about Collective Plaintiffs' misgendering and … the Division has not warned them that their desired approach is unlawful.
- [T]hese … factors are enough to weigh against a finding of credible threat of enforcement…. [*Defending Education* at *16.]

Although the district court opinion made other comments about injunctive relief, the magistrate judge's recommendation was "adopted" by the district

judge. Neither of the magistrate's reasons to deny standing are persuasive in the least. Instead, they reflect a complete disregard for the real-world realities faced by Appellants in pre-enforcement regulatory challenges. Facing a pre-enforcement challenge, one can anticipate that every bureaucratic agency being challenged will assert that there may be reasons that enforcement might not be pursued. And, the agency can withhold issuance of warnings until pre-enforcement litigation ends. The LGBTQ political operatives who were sufficiently politically savvy to push through these restrictions on speech certainly will not file complaints until the pre-enforcement challenge is resolved. The magistrate judge and the district judge disregard these realities.

Additionally, the attorney's fees of the Colorado Civil Rights Division being paid by taxpayers are virtually unlimited, but the barriers to litigating by those censored by such law are not. If this pre-enforcement challenge is barred, funds may not be available to defend a single business against a complaint. Even in the absence of a finding of violation and an award of damages, once again, "the process is the punishment."[4] The Supreme Court noted in *303 Creative*,

---

[4] Franz Kafka's book <u>The Trial</u> (1925) explained the reality of a citizen confronting an oppressive government. However, this particular phrase is sourced to Malcolm M. Feeley's 1979 book <u>The Process is the Punishment: Handling Cases in a Lower Criminal Court</u>, and it has since been used to

under CADA, "anyone in the State may file a complaint … and initiate 'a potentially burdensome administrative hearing' process." *303 Creative* at 583.

CADA unleashes the entire homosexual and transgender population of Colorado as private enforcers, to punish business owners who disagree with the use of scientifically incorrect pronouns — even, as in this case, doctors, who must distinguish between biological males and females for purposes of proper medical treatment. Again and again, offended activists, who have endless other outlets for the goods and services they seek, have used CADA and similar laws as a club to beat Christian business owners into submission.

When Colorado's non-discrimination laws have been challenged, the Colorado district court and this Court too often have failed to fulfill their role to strike down those laws which infringe on First Amendment rights. This is not only the view of these *amici*, but also the view of the Supreme Court, as discussed *infra*.

The district court did no better than the magistrate judge in its analysis of standing. It argued that Defendant Sullivan's "interpretation" of the new statute

---

describe how the ordeal of the process can be greater than the statutory punishment, and is imposed on the citizen even without any finding of violation or guilt — simply an accusation.

(which the court never described) "operates like a disavowal" of intent to enforce the amendments to CADA. *Defending Education* at *16. Although the court did not explain the matter, apparently Defendants claim that use of scientifically accurate pronouns "must rise to the level of harassment to be a violation." *Id.* at *28. CADA, of course, makes no such promise. As Appellants point out, although "an existing Commission regulation purports to prohibit [use of scientifically accurate pronouns] when it rises to the level of 'harassment,' … H.B. 25-1312 doesn't ban harassment; it bans *all* refusals to use a 'chosen name' or other preferred terms of 'addres[s].'" Brief of Defending Education at 51, quoting Colo. Rev. Stat. § 24-34-301(9).

As Appellants also note, "Defendants cannot defeat pre-enforcement standing with a mid-litigation statutory construction argument. Such arguments 'are all too easy to make and all too hard to enforce, which probably explains why the Supreme Court has refused to accept them.'" *Id.* at 37 (quoting *West Alabama Women's Ctr. v. Williamson*, 900 F.3d 1310, 1328 (11th Cir. 2018)).

The district court intentionally turned a blind eye toward Colorado's dark history of discrimination against disfavored speech and religious exercise. It went well beyond "naivete." It blithely assumed that when Colorado added

pronouns and "name choices" to CADA last year, it did so for no enforcement reason at all. This is willful blindness, not naivete, denying "access to the courts to individuals who [oppose] the political and ideological agendas of judges."[5]

The district court below has again taken Colorado's side, fashioning new rules of standing as a reason not to reach the merits of Appellants' claims. The cases here are straightforward constitutional challenges to a law that facially discriminates based on viewpoint of speech and in particular discriminates against speech based in traditional Christian religious beliefs about the created order and sexual morality.

The Supreme Court has repeatedly recognized that standing rules are relaxed in evaluating laws restricting speech, due to the "chilling effect" of the law — which is danger of self-censorship based on a "reasonable fear of prosecution." It need not be proven that the threat is imminent or certain, which is essentially the standard apparently used by the magistrate judge and district court judge. Credible threat of enforcement is relaxed where, as here, the law restricts core, political, viewpoint-based, religious speech. *See, e.g.*, *Scott v. Allen*, 153 F.4th 1088 (10th Cir. 2025); *Peck v. McCann*, 43 F.4th 1116 (10th

---

[5] Richard Pierce, "Is Standing Law or Politics?," 77 N.C. L. Rev. 1741, 1742-43 (June 1999).

Cir. 2022). Past enforcement of similar laws, as here, provides a "credible threat." Despite the magistrate judge's clutching at straws, there has been no disavowing of enforcement. *See, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).

CADA has become the modern equivalent of Jim Crow laws by relegating those embracing Biblical Morality to second-class status. And it goes even further than that, by penalizing those who recognize the basic biological reality that there are two sexes, male and female, defined by chromosomes — a biological fact which virtually every American understood just 20 years ago.

Again and again, in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018), *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), and *Chiles v. Salazar*, 146 S. Ct. 1010 (2026), the Supreme Court has been required to rein in the Colorado political class and its army of private activist enforcers, to defend the speech and religious rights of Coloradoans. Now, the district court insists on its right to "exhibit a naiveté from which ordinary citizens are free,"[6] and pretend that Colorado again strengthened CADA

---

[6] *DOC v. New York*, 588 U.S. 752, 785 (2019).

last year, but this time, for the first time, the state has no intention of actually enforcing it.

It is difficult to understand why the plaintiffs, whose speech will most certainly be chilled by the new CADA provisions, do not have standing under well-established case law. Certainly the magistrate judge and district court judge offered no plausible reasons for their decision to shut the courthouse door on the Christian businesses of Colorado. This is a good time to recall the words of Chief Justice John Marshall about the judicial duty:

> We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty. [*Cohens v. Virginia*, 19 U.S. 264, 404 (1821).]

The manipulation of the rules of standing is not infrequently the way in which a court, for whatever reason, can avoid deciding a case. In a 1999 law review article, George Washington University Law School Professor Richard Pierce noted that Americans "can predict judicial decisions … with much greater accuracy if they ignore doctrine and rely entirely on a simple description of the law of standing that is rooted in political science: judges provide access to the

courts to individuals who seek to further the political and ideological agendas of judges."[7]  The district court decision below illustrates Professor Pierce's thesis.

## II.  COLORADO'S LEGISLATURE BRAZENLY EMPLOYS ITS POLICE POWERS TO CENSOR SPEECH AND IMPEDE THE FREE EXERCISE OF RELIGION.

As originally enacted in 1957, the Colorado Anti-Discrimination Act protected employment discrimination based on five inherent attributes of personhood:  "race, creed, color, national origin or ancestry."[8]

Beginning in 2007, however, the Colorado legislature came to believe that it had the authority to expand any historic understanding of "public accommodations" to use CADA to coerce persons embracing traditional morality to bow at the altar of homosexuality and gender identity.  The fact that these amendments infringed on the speech and free exercise of religion rights of many Coloradoans seemed to be of no import.  Over the years, various state legislators appear to have competed with each other to find new ways (*e.g.,* punitive damages, attorney fee recovery) to punish those with Biblical moral compunctions about participating in and serving the interests of those exhibiting

---

[7]  Richard Pierce, *supra*.

[8]  Colorado General Assembly, Chapter 176 (1957). Session Laws 1951-2000, 1618.

behaviors which had traditionally been considered immoral. *See, e.g., Bowers v. Hardwick*, 478 U.S. 186 (1986). In this way, Colorado has declared Biblical opposition to homosexuality and transgenderism to constitute unlawful discrimination.

This has been a deliberate strategy of the LGBTQ movement. The LGBTQ movement first represented that all it wanted was to have its behaviors decriminalized, *e.g., Lawrence v. Texas*, 593 U.S. 558 (2003) (overturning *Bowers*); then it sought toleration, *e.g., Romer* (1996); then normalization, *e.g., Windsor* (2013) and *Obergefell* (2015); then protected status, *e.g., Bostock v. Clayton County*, 590 U.S. 644 (2020); and now a duty forced on others to accept, *e.g.,* CADA; and sometimes celebrated, *e.g.,* government DEI policies and official Gay Pride days.

The portion of CADA at issue here forbids so-called "places of public accommodation" from "deny[ing] to an individual or a group, because of … sexual orientation, gender identity, [or] gender expression," the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation…." Colo. Rev. Stat. § 24-

34-601(2)(a). In 2025, Colorado enacted HB25-1312, which amend[ed] CADA's definition of "gender expression" to provide:

> an individual's **way of reflecting and expressing** the individual's gender to the outside world, typically demonstrated through appearance, dress, behavior, **chosen name**, and **how the individual chooses to be addressed**. [Colo. Rev. Stat. § 24-34-301(9) (emphasis added).]

CADA masquerades as a law which demands tolerance for politically favored homosexual and so-called "transgender" populations. Operationally, however, it takes sides in some of the most important issues of our day by inflicting a high price on those who embrace Biblical morality.

## III. COLORADO'S LAW IS OUTSIDE THE TRADITION OF PUBLIC ACCOMMODATION AND ANTI-DISCRIMINATION LAWS.

Colorado's CADA appears to operate on the assumption that any law labeled a "public accommodations" law or an "anti-discrimination" law is immune from challenge. However, the courts should require Colorado to establish a foundation in an established line of legal authority — "public accommodations" laws regulating certain categories of businesses; or anti-discrimination laws based on attributes such as race. Although both businesses and courts too often have assumed the constitutionality of laws such as CADA, this assumption is false.

These *amici* believe it would be a grave mistake for this Court to decide the case without considering the history and tradition of these two sources of authority. Upon examination, it appears clear that CADA has no relevant historical antecedent in the founding era when the First Amendment was ratified.

### A.     The Law of Public Accommodations.

The doctrine of public accommodations originated as a common law rule applicable only to inns in rural England and was narrowly designed to meet a specific need to protect travelers from highwaymen. In a 1906 treatise, The Law of Innkeepers and Hotels, Harvard Law Professor Joseph Beale, Jr. described the scope of that common law rule, explaining that English common law allowed all businesses to decide with whom to do business, but onto that general rule was engrafted a narrow exception for **innkeepers**. The rule imposed a special duty on those businesses offering rooms to the public to rent to serve all comers. The reason for the narrow exception is critical to understand — to protect travelers from the risk of attacks from highwaymen and robbers during the dark of night.[9]

There are English cases which demonstrate that the innkeepers' duty was limited only to providing lodging and did not even extend to having access to

---

[9] *See* Joseph Beale, Jr., The Law of Innkeepers and Hotels, § 15 (William J. Nagel: 1906).

purchase food at a tavern associated with the inn.[10]  From that doctrine developed similar common law obligations imposed on "**common carriers**" operating under government license, such as railroads.[11]  Other than those few businesses, "proprietors or purely private enterprises were under no such obligation, the latter enjoying an absolute power to serve whom they pleased."[12]  Thus, with these exceptions that do not apply here, all businesses had unbridled freedom to decide whom they would serve.[13]

With CADA, Colorado has flipped the doctrine of "public accommodations" to apply in a limitless fashion to govern "**any place of business** engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public."  C.R.S.

---

[10]  *Id.* at §§ 15-16 ("The innkeeper supplies all needs of a traveller.  The innkeeper supplies all the entertainment which the weary traveller actually needs on his road; which in lowest terms is food, shelter and protection.…  Thus a house which does not supply lodging is not an inn; and this rule excludes from among inns a restaurant or eating house.").  *Id.* at § 15.

[11]  *Id.* at §§ 343-44.

[12]  John Sherry, The Laws of Innkeepers at 45 (Cornell Univ. Press: 1993) (citation omitted) (emphasis added).

[13]  Reflecting established legal principles, many businesses posted signs stating:  "We reserve the right to refuse service to anyone."  *See, e.g.*, Marte Gunderson, "Businesses can refuse service to anyone.  Even Sen. Lora Reinbold," *Anchorage Daily News* (Nov. 19, 2020).

§ 24-34-600.3 (emphasis added).  The only businesses exempt from "public accommodation" under CADA are places "principally used for religious purposes."  C.R.S. § 24-34-600.3(1)(b).

Further confirming the fact that common law public accommodation laws did not protect sexual practices is the fact that at common law homosexual behavior was considered a "crime against nature" to be punished, rather than a requirement for entry into a legally protected class.  *See* W. Blackstone, IV <u>Commentaries on the Laws of England</u>, Ch. 15, Prt IV, pp. 214-17.  Thus, the common law of public accommodations certainly provides no precedential authority for a weaponized law like CADA.

### B.    Laws Prohibiting Racial Discrimination.

When *Masterpiece Cakeshop* was argued before the Supreme Court, there were questions from the Court comparing CADA with laws prohibiting racial discrimination, implying that since racial discrimination can be prohibited, so can discrimination against homosexual behavior.  There is no historical justification for this position.

In 1964, Congress relied on the Commerce Clause to federalize a slightly expanded version of public accommodations, when it enacted the 1964 Civil

Rights Act "'to promote the general welfare by eliminating discrimination based on race, color, religion, or national origin in … public accommodations….'" H.R. Doc. No. 124, 88th Cong., 1st Sess., at 14."[14] The constitutionality of that law was challenged, but the Warren Court sanctioned that statute under the Commerce Power.

The 1964 Act as originally passed, and as in effect today, expanded the rule only to include two other categories of businesses:

> [i] any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises … [ii] any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment.  [Civil Rights Act of 1964, Pub. L. 88-352.][15]

Since 1964, numerous states have gone far beyond the Civil Rights Act in creating a vast array of businesses they now label as places of "public accommodations."  In 2000, the Supreme Court upheld the right of the Boy

---

[14]  *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 245 (1964).

[15]  Congress repeatedly refused to amend the 1964 Civil Rights Act to protect homosexuals, yet the Supreme Court amended it for them (to protect both homosexuals and so-called transgender persons) by admittedly taking the words "because of sex" completely out of context to reach a decision that was egregiously wrong from the moment it was issued.  *See Bostock v. Clayton County*, 590 U.S. 644 (2020).

Scouts of America to revoke the membership of a scoutmaster who had declared that he was a homosexual, despite a New Jersey public accommodation statute. *Boy Scouts of America v. Dale*, 530 U.S. 640, 662 (2000). Aside from *Dale*, instances of the Supreme Court imposing any limits on the ability of states to infringe on expressive or free exercise rights of citizens are all too rare in modern times.[16]

The authority of government to prohibit discrimination based on "race" is not at issue here. Moreover, according to Scripture, there is only one "race" — the human race. God made from one man every nation. *See Acts* 17:26. God shows no partiality among men as men. *See Romans* 2:11; *Acts* 10:45; *James* 2:9. By contrast, separation from immoral behavior is commanded. ("Wherefore come out from among them, and be ye separate, saith the Lord, and touch not the unclean thing; and I will receive you....") (2 *Corinthians* 6:17).

Among the most curious arguments in prior cases is Colorado's apparent belief that homosexuals and persons identifying as "transgender" are disfavored classes which need protection. While that argument might have had some

---

[16] *See also*, *e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557 (1995) (the Supreme Court allowed a Catholic parade to restrict entry by a homosexual parade participant, because the participant's message was antithetical to the expressive beliefs of the parade organizers).

credibility 20 years ago (at least regarding homosexuals), a string of decisions by the courts has empowered homosexual and "transgender" activists, resulting in Christian business owners now being the politically disfavored group. *See, e.g., Lawrence*, *Obergefell*, and *Bostock*.

These decisions had great effect on the political landscape, and the notion that homosexuals or persons identifying as "transgender" constitute some type of a politically powerless "discrete and insular minorit[y]"[17] who need protection from discrimination by the rest of society is absurd. The very existence of modern public accommodation laws, and the zeal with which they are enforced, demonstrates that the truth is the opposite — Christian businesses are more the discrete and politically powerless community which is being preyed upon by militant homosexuals and their political and religious allies and supporters in government. *See, e.g.*, *Olympus Spa v. Armstrong*, 169 F.4th 817 (9th Cir. 2026) (Lee, J., dissenting) ("the Washington Human Rights Commission exerted

---

[17] *See United States v. Carolene Products Co.*, 304 U.S. 144, 152, n.4 (1938) (where Justice Harlan Stone simply posed the question "whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry.").

the full force of state power to bully members of a politically weak minority group [a Christian-owned Korean women's spa]").

The LGBTQ community likely will claim that CADA does not restrict any type of permissible religious liberty, and that it prohibits only commercial conduct, not private words. They do not believe that any religion based on Biblical morality is deserving of any respect. However, whenever there is a conflict between their sexual agenda and the religious view of others, they believe their sexual agenda must prevail. This is a relatively new phenomenon in the law and does not deserve to be treated as a legal truism.[18]

It has become a decade-long drumbeat. Militant homosexual activists with a nearly unlimited array of professional options available team up with state agencies to impose destructive fines and attorney fees amounting to hundreds of thousands of dollars, license revocations, and business closures on Americans whose religious beliefs fail to fit the "politically correct" requirements. Business

---

[18] Chai Feldblum, nominated by President Barack Obama to the Equal Employment Opportunity Commission, famously declared that she sees "a conflict between religious liberty and sexual liberty, but in almost all cases, sexual liberty should win. I'm having a hard time coming up with any case in which religious liberty should win." Molly Prince, "Mike Lee Blocked EEOC Nominee Who Believes Sexual Liberty Trumps The First Amendment," *Daily Caller* (Dec. 20, 2018).

owners in Colorado, Washington, New Mexico, Iowa, New York, Kentucky, and other states have been targeted, and in some cases forced out of business.[19] The sanctions authorized by these laws are classified as civil, but are often more severe than criminal penalties. Moreover, they provide no right to jury trial, as administrative agencies bring charges, make findings, and impose sentences.

Until the question of the limits of state power in public accommodations is addressed and brought back in line with the history and tradition of these laws at the founding, states that so desire can and will continue to expand the concept of "public accommodations" to a point where militant homosexual activists can effectively drive any business owner with a religiously dissenting view completely from the marketplace, rendering "free exercise of religion" a mere "parchment barrier."

## CONCLUSION

For the foregoing reasons, the decision of the district court should be reversed and a preliminary injunction be entered.

---

[19] *See, e.g.*, Dave Bohon, "Christian Businesses Targeted Over Refusal to Serve Gay Weddings," *The New American* (Aug. 26, 2013); "NY photographer fights for freedom to create according to her beliefs," *Alliance Defending Freedom* (Jan. 12, 2022); Father Mark Hodges, "Christian couple loses business for refusing to participate in gay 'wedding'," *LifeSiteNews* (June 25, 2015).

26

Respectfully submitted,

/s/ William J. Olson

WILLIAM J. OLSON*

JOSEPH W. MILLER
  LAW OFFICES OF JOSEPH MILLER, LLC
  Council Grove, KS

JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA  22180-5615

MICHAEL BOOS
  CITIZENS UNITED
  Washington, DC

  (703) 356-5070
  wjo@mindspring.com
*Attorney of Record

RICK BOYER
  INTEGRITY LAW FIRM
  Lynchburg, VA

*Attorneys for Amici Curiae*
June 15, 2026

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.      That the foregoing Brief *Amicus Curiae* of America's Future, et al., in Support of Plaintiffs-Appellants and Reversal complies with the type-volume limitation of Rule 32(a)(7)(B), Federal Rules of Appellate Procedure, because this brief contains 5,449 words, excluding the parts of the brief exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point CG Times.

*/s/ William J. Olson*
William J. Olson
Attorney for *Amici Curiae*
Dated:  June 15, 2026

# CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of America's Future, et al., in Support of Plaintiffs-Appellants and Reversal, was made, this 15th day of June 2026, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

_/s/ William J. Olson_
William J. Olson
Attorney for *Amici Curiae*

# CERTIFICATE OF DIGITAL SUBMISSION

I HEREBY CERTIFY that with respect to the foregoing Brief *Amicus Curiae* of America's Future, et al., in Support of Plaintiffs-Appellants and Reversal, all required privacy redactions have been made, and that the hard copies being submitted to the clerk's office are exact copies of the electronic version. I FURTHER CERTIFY that the digital submission of this document has been scanned for viruses with scanning program McAfee Internet Security, version 1.40.161.1, most recently updated on June 15, 2026, and according to the program, the file is free from viruses.

          */s/ William J. Olson*
          William J. Olson
          Attorney for *Amici Curiae*