# United States Court of Appeals
## for the
# Tenth Circuit

DEFENDING EDUCATION, et al.,

*Plaintiffs-Appellants,*

— v. —

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity, et al.,

*Defendants-Appellees,*

COMMITTEE OF FIVE, INC., d/b/a XX-XY Athletics,

*Plaintiff-Appellant,*

— v. —

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity, et al.,

*Defendants-Appellees,*

DOXA ENTERPRISES, LTD., d/b/a Born Again Used Books,

*Plaintiff-Appellant,*

— v. —

AUBREY C. SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity, et al.,

*Defendants-Appellees,*

---

On Appeal from the United States District Court for the District of Colorado

The Honorable Regina M. Rodriguez

District Court Case Nos. 1:25-CV-01572-RMR-MDB, 1:25-CV-01668-RMR-MDB, and 1:25-CV-2177-RMR-MDB

## ANSWER BRIEF – ORAL ARGUMENT REQUESTED

PHILIP J. WEISER
Attorney General
JANNA K. FISCHER*
Senior Assistant Attorney General
NORA Q.E. PASSAMANECK*
Senior Assistant Attorney General
HELEN NORTON*
Deputy Solicitor General
DOMINICK D. SCHUMACHER*
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: 720-508-6000
Email: janna.fischer@coag.gov
nora.passamaneck@coag.gov
helen.norton@coag.gov
dominick.schumacher@coag.gov
*Counsel of Record
*Attorneys for Defendants-Appellees
Aubrey C. Sullivan, Sergio Cordova,
Geta Asfaw, Mayuko Fieweger, Daniel
S. Ward, Jade R. Kelly and Eric Artis,
in their official capacities*

PHILIP J. WEISER
Attorney General
TALIA KRAEMER*
Senior Assistant Attorney General
LANE TOWERY*
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: 720-508-6000
Email: talia.kraemer@coag.gov
lane.towery@coag.gov
*Counsel of Record
*Attorneys for Defendant-Appellee
Attorney General Weiser, in his official
capacity*

ORAL ARGUMENT REQUESTED

**TABLE OF CONTENTS**

PAGE

STATEMENT OF RELATED CASES ..............................................viii

GLOSSARY ....................................................................................viii

INTRODUCTION .............................................................................. 1

STATEMENT OF THE ISSUES ......................................................... 4

STATEMENT OF THE CASE ............................................................. 5

   I. CADA's public accommodations provisions .................................. 5

      A. CADA's recognition of gender expression as a protected trait 8

      B. History of enforcement of gender expression cases under
      CADA ................................................................................ 11

   II. The Appellants in the three related appeals ............................ 12

      A. Medical-Appellants (Dr. Travis Morrell, Dr. Valeri Leswing,
      and Dr. Leswing's practice Mountain Pediatrics) ..................... 12

      B. Advocacy-Appellants (CPAN, PKC, and Dr. Travis Morrell for
      purposes of his personal speaking) ............................................. 14

      C.  Associational-Appellants (DE and DNH) .............................. 15

      D. Retail-Appellants (XX-XY and Born Again) .......................... 15

      E. The Division and Commission's analysis of Appellants'
      proffered conduct ...................................................................... 18

   III. Proceedings below ................................................................ 20

SUMMARY OF THE ARGUMENT .................................................. 24

ARGUMENT ................................................................................... 27

i

## TABLE OF CONTENTS

**PAGE**

I. Appellants must meet a heightened standard because they seek to alter the status quo ................................................................. 27

II. On likelihood of success, Appellants failed to make a clear showing of credible fear of CADA enforcement necessary for standing ..................................................................................... 35

   A. Advocacy-Appellants cannot show credible fear because they are not places of public accommodation ..................................... 39

   B. The remaining Appellants cannot show credible fear of enforcement of the Publications Provisions .............................. 44

   C. The remaining Appellants cannot show credible fear for their proposed conduct on the Accommodations Provision ................. 49

      1. The district court correctly determined that the evidence weighed against Appellants on disavowal .............................. 51

      2. Appellants do not meet their burden to show past CADA enforcement for misgendering or deadnaming ....................... 55

   D. The district court properly weighed all factors in its credible fear analysis ................................................................................. 58

III. The district court correctly found that Appellants have not carried their burden on the remaining preliminary injunction factors ..................................................................................... 62

IV. Should this Court nevertheless find a credible fear of enforcement, it should remand for the district court to consider Appellees' other threshold arguments in the first instance ........... 64

CONCLUSION .............................................................................. 70

**TABLE OF AUTHORITIES**

PAGE

**CASES**

*303 Creative v. Elenis*, 6 F.4th 1160 (10th Cir. 2021) ...................... 39, 59

*303 Creative v. Elenis*, 600 U.S. 570 (2023) ................................. 6, 57, 63

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) ........ 50

*Baker v. Carr*, 369 U.S. 186 (1962) ........................................ 51

*Bauer v. Shepard*, 620 F.3d 704 (7th Cir. 2010) .................................. 37

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067 (10th Cir. 2009) ................................................................. 28

*Blow v. North Carolina*, 379 U.S. 684 (1965) ......................................... 7

*Braidwood Mgmt. v. EEOC*, 70 F.4th 914 (5th Cir. 2023) ..................... 53

*Bryant v. Woodall*, 1 F.4th 280 (4th Cir. 2021) ...................................... 58

*Cerame v. Slack*, 123 F.4th 72 (2d Cir. 2024) ........................................ 58

*Chamber of Commerce v. Edmondson*, 594 F.3d 742 (10th Cir. 2010) .. 36

*Chiles v. Salazar*, 146 S. Ct. 1010 (2026) ......................................... 39, 57

*Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826 (6th Cir. 2024) ...................................................................... 30, 53

*Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174 (10th Cir. 2000) .......................................................... 47

*Colorado Motor Carriers Ass'n v. Town of Vail*, 153 F.4th 1052 (10th Cir. 2025) ...................................................................... 28

**PAGE**

*Courthouse News Serv. v. N.M. Admin. Off. of Cts.*, 53 F.4th 1245 (10th Cir. 2022) ...............................................................................28

*DaimlerChrysler v. Cuno*, 547 U.S. 332 (2006).....................................35

*Darren Patterson Christian Academy v. Roy*, 688 F. Supp. 3d 1163 (D. Colo. 2023) ..............................................................................................57

*Doe v. Mut. of Omaha Ins. Co.,* 179 F.3d 557 (7th Cir. 1999) ...............43

*Ex Parte Young*, 209 U.S. 123 (1908)......................................................67

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ......................................28

*Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020)....................................36

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792 (10th Cir. 2019) ..............................................................................................28

*Gays Against Groomers v. Garcia*, 169 F.4th 981 (10th Cir. 2026)........39

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ...............................................................................................34

*Hager v. Brinker Texas, Inc.*, 102 F.4th 692 (5th Cir. 2024) ..................43

*Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141 (10th Cir. 2020) ..............................................................................................................33

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) ..............................32, 46

*Hedges v. Obama*, 724 F.3d 170 (2d Cir. 2013) .....................................37

*Heidman v. South Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) .......63

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ......................51

*Hoye v. City of Oakland*, 653 F.3d 835 (9th Cir. 2011).........................53

iv

**TABLE OF AUTHORITIES**

PAGE

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977)........ 44

*Janus v. AFSCME*, 585 U.S. 878 (2018) ................................................. 38

*Kan. Health Care Ass'n v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536 (10th Cir. 1994) ................................................. 63

*Labrador v. Poe*, 144 S. Ct. 921 (2024) ................................................. 34

*Lewis v. Casey*, 518 U.S. 343 (1996) ................................................. 35, 46

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................... 49

*Masterpiece Cakeshop v. Colo. Civil Rights Commission*, 584 U.S. 617 (2018) ................................................. 57

*McDonnell v. City & Cty. of Denver*, 878 F.3d 1247 (10th Cir. 2018) .... 27

*Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221 (10th Cir. 2019) ................................................. 27

*Murthy v. Missouri*, 603 U.S. 43 (2024) ................................ 35, 49, 51

*N. Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999) ................................................. 47

*National Republican Senatorial Comm. v. Federal Election Comm'n*, 146 S. Ct. 2404 (2026) ................................ 59, 60, 61, 62

*New Hampshire Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8 (1st Cir. 1996) ................................................. 37

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) ................................................. 32, 34

*Peck v. McCann*, 43 F.4th 1116 (10th Cir. 2022) ............................... 36, 65

# TABLE OF AUTHORITIES

**PAGE**

*PGA Tour v. Martin*, 532 U.S. 661 (2001)..................................................42

*Richison v. Ernest Grp., Inc.*, 634 F.3d 1123 (10th Cir. 2011) ......... 40, 68

*Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, New Mexico*, 993 F.3d 802 (10th Cir. 2021) ........................................................35

*SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096 (10th Cir. 1991) . 32, 34

*Schaffer v. Clinton*, 240 F.3d 878 (10th Cir. 2001)..................................51

*Singleton v. Wulff*, 428 U.S. 106 (1976) ...................................... 67, 68, 69

*St. Mary Cath. Par. in Littleton v. Roy*, 736 F. Supp. 3d 956 (D. Colo. 2024) ......................................................................................47

*St. Mary Cath. Parish v. Roy*, 154 F.4th 752 (10th Cir. 2025)..............57

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)........... 50, 61, 62

*Tabor v. Hilti, Inc.*, 703 F.3d 1206 (10th Cir. 2013) ..............................67

*United States v. Davis*, 339 F.3d 1223 (10th Cir. 2003) ........................40

*United States v. Texas*, 144 S. Ct. 797 (2024).........................................34

*Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*, 22 F.4th 892 (10th Cir. 2022) ...............................................................69

*Virginia v. Am. Booksellers Assn., Inc.*, 484 U.S. 383 (1988) ........... 50, 58

*Ward v. Utah*, 321 F.3d 1263 (10th Cir. 2003) ................................36, 65

*West Virginia v. EPA*, 597 U.S. 697 (2022)..............................................61

*Westar Energy, Inc. v. Lake*, 552 F.3d 1215 (10th Cir. 2009)................69

*Whole Woman's Health v. Jackson,* 595 U.S. 30 (2021)..........................61

vi

# TABLE OF AUTHORITIES

**PAGE**

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ..................................................................................... 35, 62

**STATUTES**

42 U.S.C. § 2000e–2(a)(1) ....................................................... 32

C.R.S. § 24-34-301(3.5) ............................................................. 9

C.R.S. § 24-34-301(9) ............................................................. 2, 9

C.R.S. § 24-34-306(1) ................................................................ 8

C.R.S. § 24-34-306(2) ........................................................... 8, 59

C.R.S. § 24-34-306(4) ................................................................ 8

C.R.S. § 24-34-601(2)(a) .......................... 1, 5, 6, 8, 10, 40, 44

C.R.S. § 24-34-601(2)(b) ............................................................ 6

C.R.S. § 24-34-701 ............................................................... 1, 44

C.R.S. § 24-34-701(1) .......................................................... 7, 40

**RULES**

3 CCR 708-1 ................................................ 1, 10, 29, 31, 58

**OTHER AUTHORITIES**

2008 Colo. Legis. Serv. Ch. 341 (S.B. 08-200) .......................... 8

2021 Colo. Legis. Serv. Ch. 156 (H.B. 21-1108) ....................... 9

H.B. 1355, 1979 Colo. Sess. Laws. 937-38 .............................. 29

H.B. 25-1312 .............................. 2, 9, 11, 18, 20, 25, 29, 30, 31, 48, 57, 63

# STATEMENT OF RELATED CASES

Pursuant to Tenth Circuit Rule 28.2(C)(3), counsel for Appellees state that the three cases listed in the caption are all related. Appellees address all three cases in a consolidated brief per this Court's Order of April 28, 2026.

# GLOSSARY

Accommodations Provision = C.R.S. § 24-34-601(2)(a) addressing discrimination in a place of public accommodation

Born Again = Appellant Doxa Enterprises, Ltd., d/b/a Born Again Used Books

CADA = Colorado Anti-Discrimination Act

Commission = Colorado Civil Rights Commission

Division = Colorado Civil Rights Division

CPAN = Appellant Colorado Parent Advocacy Network

DE = Appellant Defending Education

Director Sullivan = Aubrey Sullivan, Director of the Colorado Civil Rights Division

DNH = Appellant Do No Harm

PI Order = March 31, 2026 Order Denying Motions for Preliminary Injunction

Publications Provisions = the provisions contained in C.R.S. § 24-34-601(2)(a) and C.R.S. § 24-34-701(1) addressing publications

PKC = Appellant Protect Kids Colorado

R&R = February 19, 2026 Report and Recommendation to Deny Motions for Preliminary Injunction

Rule 81.6 = 3 CCR 708-1, Commission Rule 81.6(A)(4)

XX-XY = Appellant Committee of Five, Inc., d/b/a XX-XY Athletics

Advocacy-Appellants = CPAN, PKC, and Dr. Travis Morrell while performing speaking engagements

Retail-Appellants = XX-XY and Born Again

Medical-Appellants = Dr. Travis Morrell in his medical practice, Dr. Valeri Leswing, and Mountain Pediatrics

# INTRODUCTION

Enacted over 45 years ago, the Colorado Anti-Discrimination Act ("CADA") prohibits denying individuals, based on their protected traits, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation. C.R.S. §§ 24-34-601(2)(a), 24-34-701. In 2008, Colorado amended CADA to include sexual orientation among the protected traits and defined sexual orientation to include transgender status. Recognizing that discrimination can take many forms, in 2009 the Colorado Civil Rights Commission ("Commission") promulgated Rule 81.6, providing that "sexual orientation harassment" is unlawful when it "creates an environment that is subjectively and objectively hostile," and may include "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun." 3 CCR 708-1, Rule 81.6(A)(4) ("Rule 81.6"). In 2021, Colorado amended CADA to identify gender expression and gender identity as distinct protected traits, no longer subsumed within the definition of sexual orientation. This amendment simply clarified the relevant vocabulary, and did not impose any new substantive protections or responsibilities.

Even though this framework has existed for years, not until 2025 did Appellants bring this action, after Colorado amended the definition of "gender expression" to include an individual's "chosen name, and how the individual chooses to be addressed." *See* H.B. 25-1312 § 8, *codified at* C.R.S. § 24-34-301(9). Just like the other definitional CADA amendments recognizing gender identity and gender expression as separate protected traits, the amendment did not add a new across-the-board rule barring public accommodations from addressing individuals using terms other than their chosen names and pronouns. Nor did it add to the ways in which a place of public accommodation might violate CADA. The amendment's sole effect was to clarify CADA's longstanding principle that a public accommodation that denies an individual the full and equal enjoyment of its services based on that person's "chosen name, and how the individual chooses to be addressed" is doing so based on that person's gender expression.

Appellants all express a desire to deadname and misgender[1] during their interactions with transgender individuals, and to

---

[1] "Deadnaming" and "misgendering" describe referring to a transgender or non-binary person with names or pronouns inconsistent with that person's gender identity.

announce their intention to do so through written policies. They insist they credibly fear that Appellees will interpret CADA to prohibit any and all misgendering and deadnaming, and that the district court erred in determining they failed to carry their preliminary injunction burden of clearly establishing standing. Appellants are wrong on both points.

Appellees have unequivocally asserted that Appellants face no credible threat of CADA enforcement based solely on their general intent to misgender and deadname because CADA on its face does not prohibit either. Regarding Appellants' written policies stating their intent to misgender and deadname, the Division and Commission provided unequivocal sworn statements that those writings do not violate CADA. Regarding Appellants' hypothetical future interactions with the public, Appellants offered no specific facts that would provide the necessary context to determine that they may someday violate CADA. Misgendering or deadnaming must rise to the level of harassment to deny persons the full and equal enjoyment of services based on a protected trait. But Appellants' assertions lack the necessary specificity. Appellants' amorphous speculation cannot meet

their burden to show a credible threat that Appellees will enforce CADA against them.

The district court did not abuse its discretion in concluding that Appellants failed to make a clear showing of credible fear of enforcement sufficient for standing. It also properly concluded that the equities support denying Appellants' request for a broad preliminary injunction against CADA provisions—including CADA's protections regarding gender expression—that have been in place for years. This Court should affirm the district court's conclusion that Appellants have not made the clear showing required for changing CADA's years-long status quo.

## STATEMENT OF THE ISSUES

1. Are Appellants seeking a disfavored preliminary injunction where their requested injunction would prevent enforcement of CADA provisions and protections that have existed for years?

2. Have Appellants established a clear showing of credible fear of enforcement of CADA's Publications Provisions where Appellants' proposed statements on their face do not violate CADA, the Division and Commission have affirmed they do not violate CADA, and CADA has never been enforced against a similar publication?

3. Have Appellants established a clear showing of credible fear of enforcement of CADA's Accommodations Provision where they have articulated an intent to deadname and misgender without any

specificity of such interactions that would allow the Court to determine whether their conduct may rise to the level of harassment?

4. If this Court reverses any portion of the district court's denial of a preliminary injunction, is remand appropriate so that the district court can address in the first instance the other threshold jurisdictional arguments raised by Appellees?

## STATEMENT OF THE CASE

## I. CADA's public accommodations provisions

Appellants challenge five of CADA's public accommodation provisions, which can be divided into two categories.

The first category, the "Accommodations Provision," prohibits activities that deny individuals, because of their protected traits, the benefits of the place of public accommodation. It provides that "a person in a place of public accommodation" may not "directly or indirectly, [] refuse, withhold from, or deny to an individual or a group," because of their protected status, "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation." C.R.S. § 24-34-601(2)(a).

In other words, this provision ensures that any individual who wants to patronize a business is not denied the "full and equal enjoyment" of an accommodation. *See 303 Creative v. Elenis*, 600 U.S.

570, 581 (2023). The Division and Commission have explained that, for a violation to occur, (1) the public accommodation must intentionally treat the individual differently based on protected status; (2) the customer must subjectively experience that conduct to be a denial of the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation; and (3) the Division must determine that a reasonable person would experience that conduct as a denial of such full and equal enjoyment. DE-3-App-007.[2]

The second category is directed to written communications. These provisions prohibit a written statement that (a) "indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual" because of their protected status, C.R.S. § 24-34-601(2)(a); (b) is "intended or calculated to discriminate or actually discriminates against any person or class of

---

[2] Appellants each filed a separate Appendix with some overlapping documents. Appellees will cite to the *Defending Education* appendix as DE-vol.-App-xx unless the document does not appear in that appendix. In that case, Appellees will cite to the appendix for *Committee of Five* as XX-XY-vol.App.xx and for *Doxa* as Doxa-vol.App.xx.

persons on account of [protected status]" in providing goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation, C.R.S. § 24-34-701(1); (c) "states that any of the accommodations, rights, privileges, advantages, or conveniences of the place shall or will be refused, withheld from, or denied to any person or class of persons on account of [protected status]," *id.*; or (d) "states that the patronage, custom, presence, frequenting, dwelling, staying, or lodging at the place by any person or class of persons belonging to or purporting to be of any [protected status] is unwelcome or objectionable or not acceptable, desired, or solicited," *id.*

In short, these "Publications Provisions" are aimed at communications that discourage individuals from seeking out the public accommodation's goods, services, facilities, privileges, advantages or accommodations because of those individuals' protected traits. *See generally Blow v. North Carolina*, 379 U.S. 684, 684-85 (1965) (holding that a sign in a restaurant window saying "whites only" communicates an intent to deny full and equal enjoyment of its goods and services in violation of Title II of the Civil Rights Act of 1964).

Any aggrieved person may file charges of discrimination under CADA with the Division, as may the Attorney General or Commission. C.R.S. §§ 24-34-306(1)(a)(1), (1)(b), (2)(a). The filing of a charge is the first of a multi-step process outlined by C.R.S. § 24-34-306. *See also* DE-2-App.151–52 ¶5 (outlining steps). The Division is responsible for investigating any charge to determine whether it is supported by probable cause, and it remains a neutral investigative agency throughout the process. DE-2-App-153 ¶6. If the Division finds probable cause of discrimination, the Commission has authority to set the case for an administrative hearing or issue the complainant a notice of right to sue. *Id.* ¶5(h); C.R.S. § 24-34-306(4).

**A.    CADA's recognition of gender expression as a protected trait**

"Gender expression" and "sexual orientation" are protected traits under CADA. C.R.S. § 24-34-601(2)(a). Colorado first included "sexual orientation" as a protected trait in 2008, defining the term to mean "a person's orientation toward heterosexuality, homosexuality, bisexuality, or transgender status or another person's perception thereof." *See* 2008 Colo. Legis. Serv. Ch. 341 (S.B. 08-200). In 2021,

Colorado added as a protected trait "gender expression,"[3] *see* 2021 Colo.

Legis. Serv. Ch. 156 (H.B. 21-1108), which it amended in 2025. The full

definition, with the added 2025 language underlined, provides:

> [A]n individual's way of reflecting and expressing
> the individual's gender to the outside world,
> typically demonstrated through appearance,
> dress, behavior, <u>chosen name, and how the
> individual chooses to be addressed</u>."

*See* H.B. 25-1312 § 8, *codified at* C.R.S. § 24-34-301(9). H.B. 25-1312

further defines "chosen name" as "a name that an individual requests

to be known as in connection to the individual's disability, race, creed,

color, religion, sex, sexual orientation, gender identity, gender

expression, marital status, familial status, national origin, or ancestry

. . . ." C.R.S. § 24-34-301(3.5).

These definitions describe the protected trait of "gender

expression." They do not identify or explain when conduct based on

that protected trait violates CADA. Rather, the definitions must be

read in the context of CADA's Accommodations and Publications

Provisions. For example, a violation of CADA's Accommodations

---

[3] At the same time, Colorado also added "gender identity," which is not
challenged in these actions.

Provision occurs when an individual is denied the full and equal enjoyment of goods and services of a place of public accommodation based on that individual's protected trait. Applied to gender expression, a violation occurs when an individual is denied the full and equal enjoyment of goods and services of a place of public accommodation based on that individual's gender expression, *i.e.*, the way they reflect and express their gender to the outside world. C.R.S. § 24-34-601(2)(a).

Commission Rule 81.6(A)(4), promulgated in 2009, puts an even finer point on when such conduct amounts to a violation. It provides that "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun" can amount to a CADA violation in the form of "unlawful harassment" when it "creates an environment that is subjectively and objectively hostile, intimidating, or offensive on the basis of sexual orientation." 3 CCR 708-1, Rule 81.6(A)(4).

As shown in both CADA's statutory language and Rule 81.6, CADA does not treat misgendering and deadnaming as *per se* unlawful practices; misgendering or deadnaming must instead rise to the level of being subjectively and objectively hostile such that it denies the

10

individual full and equal enjoyment of the place of public accommodation based on protected class status. 3 CCR 708-1, Rule 81.6(A)(4); DE-3-App-005–09.

### B. History of enforcement of gender expression cases under CADA

Well before the passage of H.B. 25-1312, the Division received complaints involving misgendering and deadnaming. But the Division has never found probable cause of discrimination against a public accommodation based on misgendering or deadnaming alone. Of the 17 public accommodations cases the Division has identified involving allegations of deadnaming and/or misgendering, it found probable cause in only two. DE-6-App-008–21. Neither rested on misgendering or deadnaming alone. *Id.*

One complainant established probable cause against a nightclub where a bouncer told them "'hey bro, you need to get out of the women's bathroom," and ultimately removed them from the establishment. DE-6-App-172. In the second case, a blood bank refused to update a transgender woman's name and gender in its database, contrary to federal guidance stating that "male or female gender should be self-identified and self-reported for the purpose of blood donation." DE-6-

App-142–45. The blood bank's failure to use the name and gender consistent with the complainant's gender identity meant that she was subjected to unequal services based on her gender identity in the form of additional screening for HIV and questions regarding her sexual partners and activity that were not required of cisgender women. *Id.*

The Division has never received a complaint about a publication or written communication based only on a public accommodation's misgendering or deadnaming someone. DE-6-App-006 ¶4; DE-3-App-012.

## II.    The Appellants in the three related appeals

All Appellants assert that they believe gender is fixed at birth and immutable, and that CADA prevents them from exercising their rights to address individuals by names and/or pronouns they believe to be "biologically accurate" rather than those consistent with individuals' gender expression. Appellants fall within the following categories:

### A.    Medical-Appellants (Dr. Travis Morrell, Dr. Valeri Leswing, and Dr. Leswing's practice Mountain Pediatrics)

Drs. Morrell (dermatologist) and Leswing (pediatrician) are both practicing medical doctors that use "biologically accurate pronouns and birth names" in treating transgender patients. DE-1-App-166 ¶6, 1-

App-183 ¶7. Both assert that they treat all patients with the same quality of care, and that they ensure that all patients feel welcome and cared for. DE-2-App-047; DE-2-App-136, 56:17-25; DE-2-App-131, 127:2-6. None of Dr. Morrell's patients has complained about his deadnaming and/or misgendering, DE-2-App-051; DE-2-App-128, while Dr. Leswing has had a number of patients who didn't return to her practice after she deadnamed and/or misgendered them. DE-7-App-004–06.

Dr. Leswing also asserts that she wants to publish a statement on her practice's Facebook page "explaining to potential patients that, because I have an obligation as a physician not to harm my patients, I will not refer to them using biologically inaccurate terms like preferred pronouns and chosen names." DE-1-App-186 ¶15. She testified that for the past "two or three years," she had been considering publishing on her Mountain Pediatrics Facebook page a review of medical literature that she says supports her views, but she has not actually written anything. DE-2-App-141–42, 80:21-81:19.

## B. Advocacy-Appellants (CPAN, PKC, and Dr. Travis Morrell for purposes of his personal speaking)

CPAN and PKC are advocacy organizations with missions directed to, among other things, precluding schools from discussing how gender identity may differ from biological sex. DE-1-App-029 ¶52; *see also* DE-1-App-118 ¶4; DE-2-App-088, 22:4-10; *see also* DE-2-App-089–90, 26:24-27:15. Neither sells goods or services; instead, they host events to further their advocacy in places of public accommodation, including outside the Colorado State Capitol and the Colorado Supreme Court, and at restaurants and hotels. DE-2-App-071, 46:5-11; DE-2-App-074–76, 50:12-51:24, 53:3-7; DE-2-App-078, 59:4-11; DE-2-App-081–82, 62:20-24; DE-2-App-010–21; DE-2-App-022–28; DE-2-App-096, 41:3-23; DE-2-App-099–100, 50:15-51:14.

Separate from his practice of medicine, Dr. Morrell regularly "speak[s] and write[s] on the issues of sex and gender as they relate to the medical profession." He does so in his personal capacity—he speaks on his own behalf and his writings are not on behalf of, and do not address, his practice at Mountain West. DE-2-App-116–18, 36:14-19; 37:5-38:6; DE-2-App-119–24, 52:6-15, 54:1-12, 65:19-66:9; 75:15-20,

14

80:16-19. During these activities, he is not offering medical services or any products. DE-2-App-116–18, 36:14-19; 37:5-38:6.

**C.    Associational-Appellants (DE and DNH)**

Both DE and DNH are "nationwide, grassroots, 501(c)(3) non-profit membership organization[s]." DE-1-App-028 ¶46; DE-1-App-045 ¶97. DE's members include CPAN executive director Lori Gimelshteyn and PKC executive director Erin Lee, and DNH's members include Dr. Morrell, Dr. Leswing, and Mountain Pediatrics. DE-1-App-029 ¶49; DE-1-App-045 ¶99. DE and DNH assert standing through their members and are not claiming to have suffered injury as organizations. *See* DE-2-App-007.

**D.    Retail-Appellants (XX-XY and Born Again)**

XX-XY and Born Again are retailers located in Colorado.

XX-XY is an athletic-apparel retailer, whose brand messaging "focuses almost exclusively on protecting women's sports from the unfair inclusion of biologically male athletes." XX-XY-1.App.0036 ¶48. It "frequently" deadnames and misgenders transgender athletes in its advertising. XX-XY-1.App.0042–45 ¶¶72-86. XX-XY asserts that it will follow this misgendering and deadnaming practice when referring to customers and other members of the public, and it issued a Policy to

15

this effect via social media the same day H.B. 25-1312 passed. XX-XY-1.App.0046–47 ¶¶92-102; *see also* XX-XY-1.App.0081–82. This Policy is limited to misgendering and deadnaming; XX-XY states that it "would love for everybody to buy our products," and "[a]nyone is free to purchase any item that they want" from XX-XY. XX-XY-2.App.0281, 10:19-22; XX-XY-2.App.0284, 18:16-19. In fact, XX-XY has assisted transgender individuals at its popup shops without incident. XX-XY-2.App.0284, 17:9-21; XX-XY-2.App.0285, 18:5-11; XX-XY-2.App.0445–46.

Born Again is a bookstore in Colorado Springs, Colorado, that sells used books featuring Christian themes. Born Again operates its business pursuant to a set of Christian beliefs and states that it will not use gendered language—including pronouns, salutations, or forms of address—matching a person's gender identity if that gender identity differs from what Born Again believes to be that person's sex assigned at birth. Doxa-1.App.113. Born Again nonetheless asserts that everyone is "worthy of dignity and respect" and that it will welcome all customers. Doxa-1.App.022 ¶4. Indeed, Born Again believes transgender customers have patronized its store, and Born Again's

employees have assisted them. Doxa-1.App.190–91, 23:15-24:3-9; Doxa-1.App.192, 27:1-22; Doxa-1.App.195–96, 30:17-31:15; Doxa-1.App.193, 28:15-21; Doxa-1.App.194, 29:6-8; Doxa-1.App.197, 32:5-20; Doxa-1.App.198, 33:4-15.

After the passage of H.B. 25-1312, Born Again drafted a "Policy on Using Biologically Accurate Language" ("Language Policy"), providing that "owners and employees will not use 'gender neutral' pronouns or neologisms . . . [and] will not refer to or address a biological female as 'Mr.,' 'he,' a 'man,' or any similarly biologically inaccurate language." Doxa-1.App.113. If a person "request[s] to use a pronoun or form of address that would violate" the Language Policy, Born Again states that it will "respectfully and charitably decline and instead use a form of address that does not contradict the individual's biological sex, such as the person's first or last name." *Id.* That name can be anything, even if associated with a gender identity that is not traditionally associated with one's sex assigned at birth. Doxa-1.App.201–02, 46:17-47:5. Born Again also drafted a post for its blog explaining its faith-based reasons for the Policy ("Blog Post"). Doxa-1.App.115. Born Again asserts that it has published neither its

17

Language Policy nor Blog Post out of concern of H.B. 25-1312. Doxa-1.App.203, 57:13-20. Born Again has nonetheless informed its employees of the Policy, which is in effect. Doxa-1.App.200, 43:9-21.

### E. The Division and Commission's analysis of Appellants' proffered conduct

Not one of the Appellants has been the subject of a CADA complaint to the Division. DE-2-App-158 ¶20; DE-2-App-160 ¶23; DE-2-App-161 ¶26. And as outlined above, the Division is aware of no probable cause finding based on misgendering and/or deadnaming alone, without additional conduct that contributed to a denial of full and equal enjoyment of a place of public accommodation.

The Division and Commission nonetheless reviewed Appellants' proposed conduct to determine whether it may violate CADA. They provided sworn discovery responses explaining that CPAN, PKC, and Dr. Morrell when speaking in his personal capacity and outside his medical practice, are not "places of public accommodation" because they do not offer any good, service, facility, privilege, advantage, or accommodation to the general public that would subject them to CADA's public accommodation provisions. DE-2-App-157–58 ¶¶18-19; DE-3-App-011.

As to Appellants' interactions with members of the public, the Division and Commission confirmed that misgendering and deadnaming on their own do not violate CADA, and that Appellants failed to describe their proffered conduct in sufficient detail to enable them to determine that any of Appellants' interactions might rise to the level of a CADA violation. Any analysis would need to consider the full circumstances of the interaction between the customer and the place of public accommodation to determine whether a reasonable person, under the circumstances experienced by the complainant, would experience the interaction as harassment and/or would otherwise experience the full course of conduct as denying them full and equal enjoyment of the place of public accommodation's goods, services, facilities, privileges, advantages, or accommodations based on their gender identity. DE-3-App-005–11; XX-XY-2.App.424–28; Doxa-2.App.334–39.

The Division and Commission further affirmed under oath and in written discovery responses that Appellants' written policies do not violate CADA because they do not state an intent to deny the full and equal enjoyment of a place of public accommodation based on an

19

individual's gender expression. DE-3-App-013–14; DE-4-App-043; XX-XY-2.App.0424–28; Doxa-2.App.340–43.

## III. Proceedings below

Shortly after H.B. 25-1312 amended CADA's definition of gender expression, Appellants filed each of the three actions asserting claims under the First and Fourteenth Amendments. They sought preliminary injunctions to preclude CADA enforcement against them, and to facially preclude enforcement of CADA's Publications Provisions and gender expression definition. DE-1-App-070, 1-App-112; XX-XY-1.App.076–77; XX-XY-1.App.083–84; Doxa-1.App.060–61; Doxa-1.App.069–71. Because Appellants are asserting pre-enforcement claims and their proposed conduct does not facially violate CADA, the Division and Commission requested and were granted limited jurisdictional discovery. DE-1-App-0230–32; XX-XY-1.App.0189–207; Doxa-1.App.120–22. Thereafter, Appellees opposed the preliminary injunctions and filed motions to dismiss arguing that Appellants lacked

standing, their claims were not ripe, and the Attorney General has immunity.[4] DE-1-App-237–84.

The magistrate judge, following a joint preliminary injunction hearing for all three cases, issued a report and recommendation ("R&R"). DE-5-App-117–30. The R&R stressed that a preliminary injunction would disturb, not preserve, the status quo because the 2025 amendments were "made to a longstanding statute," and the Division's enforcement scheme under the statute was "itself the status quo." DE-5-App-119.

The magistrate judge further determined that Appellants did not clearly establish a credible fear of enforcement for purposes of standing given that: (1) on disavowal, Appellees confirmed that they "do not intend to prosecute . . . the mere act of misgendering and deadnaming;" and (2) on past enforcement, there is no evidence of any CADA

---

[4] Appellees' Motions to Dismiss are still pending, with the magistrate judge recommending dismissal as to Advocacy-Appellants because they are not places of public accommodation, and dismissing as to DE because its only basis for standing is as an association through Advocacy-Appellants. DE-5-App-198–200. The magistrate judge recommended denying the remainder of the motions, noting that standing has a lower burden on a motion to dismiss than the preliminary injunction at issue here. DE-5-App-195.

complaints against any Appellant, no evidence of any warning by Appellees to Appellants, no complaints to any state official that would lead to enforcement, and the Division has never "found probable cause in any public accommodations case solely based upon a respondent's place of public accommodations, failure to use an individual's chosen name, and/or how the individual chooses to be addressed." DE-5-App-126–27. The R&R determined that these factors weighed against a credible fear of enforcement, and outweighed that the public may file complaints under CADA.

On the remaining preliminary injunction factors, the R&R determined that there is no clear showing of irreparable harm given the "absence of pending complaints or a history of enforcement tied to the specific conduct [Appellants] describe," and given that the CADA provisions Appellants challenge have been in place for decades. DE-5-App-129. On balance of the harms, the R&R found that Colorado had "articulate[d] significant interest in administering and enforcing its anti-discrimination regime." *Id*.

Over objections filed by Appellants, the district court adopted the R&R. DE-5-App-149–72. The district court confirmed that Appellants

are seeking a disfavored injunction, disrupting the status quo. It stressed that under the "specific facts" of this case, Appellants had not carried their burden of making a clear showing of credible fear sufficient for standing. DE-5-App-166. On disavowal, the district court explained that Appellants "have represented they will not deny their goods or services to anyone [such that] there is no violation of the statute on its face," and Appellees "have provided sworn declarations, deposition testimony, and discovery responses explaining that [Appellants'] intended misgendering and deadnaming alone is not conduct that violates CADA *per se*—the conduct must rise to the level of harassment to be a violation." DE-5-App-167. As to Appellants' policies, the district court acknowledged that "the Division has not received any complaints against a place of public accommodation regarding its policy or publication on misgendering or deadnaming." *Id*. These facts suggested that an action filed with the Division "would not be taken under the circumstances presented by Collective Plaintiffs." DE-5-App-167–68. On past enforcement of the same conduct, the district court rejected Appellants' contention that the two Division cases Appellants relied upon—the blood bank case and the nightclub

case—were similar. In those cases, "the complainants were denied the services of the public accommodations because of their gender identity," and in these cases Appellants "have expressed that they intend to offer their goods or services to everyone." DE-5-App-168–69. The weight of these two factors, even considering that anyone may initiate charges under CADA, prevented Appellants from carrying their burden on credible fear.

On the remaining factors, the district court determined that Appellants failed to show irreparable harm where they failed "to provide evidence of a single complaint or history of enforcement tied to the conduct at issue," and that the public's "interest in protecting an individual's constitutional rights" is insufficient on its own for preliminary relief. DE-5-App-171.

## SUMMARY OF THE ARGUMENT

Because Appellants challenge a decades-old law and protections that have been part of CADA's enforcement scheme since 2009, they must make a heightened showing that they meet the requirements for a preliminary injunction. The district court correctly found that Appellants failed to meet that standard.

First, Appellants seek to prevent Appellees from (1) enforcing CADA's Publications Provisions against anyone and (2) enforcing CADA's Accommodations Provision against them based on misgendering and deadnaming alone. The Publications Provisions have been in effect for decades and apply to all protected traits, not just gender expression. And H.B. 25-1312 merely clarified in statute the definition of gender expression that had been in rule for years.

Second, Appellants failed to show a likelihood of success on the merits, because they did not clearly establish standing.

The Advocacy-Appellants failed to show a credible fear of enforcement because they are not places of public accommodation under CADA and the law does not apply to them.

The Retail-Appellants and Medical-Appellants failed to clearly show a credible fear of enforcement on the Publications Provisions, because the Division, after reviewing the parties' publications, disavowed enforcement based on those publications. No publication on its face shows an intent to deny an individual the full and equal enjoyment of a place of public accommodation by, for example, stating that transgender individuals are not welcome, that they cannot make

25

certain purchases, or that they will be charged more than cisgender individuals.

The Retail-Appellants and Medical-Appellants also failed to clearly demonstrate a credible fear of enforcement of CADA's Accommodations Provision because they do not offer any details of their proposed misgendering and deadnaming, and the Division has stated in sworn testimony that such misgendering and deadnaming does not by itself violate CADA unless it rises to the level of harassment. Medical-Appellants and Retail-Appellants failed to describe conduct that would rise to the level of harassment, instead stating that they will provide their goods and services to all and will treat everyone with respect.

Finally, the district court correctly found that Appellants failed to meet their burden on the rest of the preliminary injunction factors. They cannot show irreparable injury where they facially challenge a law that has been in effect for decades. They also fail to meet their burden to show the balance of harms tips in their favor or that an injunction would serve the public interest.

This Court should affirm the district court's denial of a preliminary injunction. Should this Court determine that Appellants met their burden on the credible fear inquiry, however, there are multiple additional reasons why Appellants cannot show a likelihood of success on the merits, as Appellees argued below. If this Court does not affirm the denial of the preliminary injunction, it should remand for the district court to address those alternative grounds for denial in the first instance, as nearly all of them pose jurisdictional questions on which Appellants bear the burden.

**ARGUMENT**

## I. Appellants must meet a heightened standard because they seek to alter the status quo.

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019). One may be granted "only when the movant's right to relief is clear and unequivocal." *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018). Moreover, "[d]istrict courts have discretion over whether to grant preliminary injunctions, and [this Court] will disturb their decisions only if they abuse that discretion." *Courthouse News Serv. v.*

*N.M. Admin. Off. of Cts.*, 53 F.4th 1245, 1254 (10th Cir. 2022) (quoting

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 796

(10th Cir. 2019)). "A district court's decision crosses the abuse-of-

discretion line if it rests on an erroneous legal conclusion or lacks a

rational basis in the record." *Id.* (citation omitted).

Here, Appellants face an even heavier burden as they seek to

disturb the status quo by "changing the last peaceable uncontested

status existing between the parties before the dispute develop[ed]."

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d

1067, 1070-71 (10th Cir. 2009). Under this standard, Appellants

"needed to meet a 'heightened standard' by making a 'stronger

showing' on the elements of a preliminary injunction." *Colorado Motor*

*Carriers Ass'n v. Town of Vail*, 153 F.4th 1052, 1065-66 (10th Cir.

2025) (quoting *Fish v. Kobach*, 840 F.3d 710, 723-24 (10th Cir. 2016));

*Free the Nipple*, 916 F.3d at 797.

This higher standard applies because Appellants seek relief on

CADA protections that have existed for years, if not decades. For

example, Appellants seek to enjoin CADA's Publications Provisions—

which apply to all protected traits—in their entirety. DE-1-App-112;

XX-XY-1.App.0083–84; Doxa-1.App.070. Such relief would unquestionably disrupt the status quo, where these provisions have existed for decades. *See, e.g.*, H.B. 1355, 1979 Colo. Sess. Laws. 937-38, available at https://scholar.law.colorado.edu/session-laws-1951-2000/8050.

Appellants also seek to enjoin Appellees from enforcing CADA against them based on their misgendering and/or deadnaming individuals, DE-1-App-112; XX-XY-1.App.0084; Doxa-1.App.069–70, but CADA has prohibited discrimination based on gender expression for years. In particular, CADA has identified gender expression as a protected trait since 2008, and Rule 81.6, outlining when "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun" amounts to a CADA violation, has been in effect since 2009. *See* 3 CCR 708-1, Rule 81.6(A)(4). H.B. 25-1312 clarified the definition of "gender expression" to provide that an "individual's way of reflecting and expressing the individual's gender to the outside world" can be demonstrated through "chosen name, and how the individual chooses to be addressed," but it did not change the protections already provided to individuals based on gender expression.

*See supra*, Statement of the Case §(I)(B) (outlining cases involving misgendering and deadnaming).

Appellants' arguments that H.B. 25-1312 effected a change in status quo should be rejected.

DE-Appellants go so far as to assert that after the passage of H.B. 25-1312, it is "illegal to misgender or deadname someone—full stop." DE at 34. That is plainly untrue. Misgendering and/or deadnaming is not a *per se* violation of CADA.[5] DE-3-App-009. All H.B. 25-1312 does is provide further detail in defining "gender expression;" it does not change when a CADA violation occurs. In other words, the use of a person's chosen name and pronouns by itself "is not 'a good, service, facility, right, privilege, convenience, advantage, or

---

[5] DE-Appellants are also wrong to rely on *Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826 (6th Cir. 2024) ("*CHC*"), which they assert held "that a similar Michigan law would be violated simply by misgendering or deadnaming." DE at 35. Not only did *CHC* concern Michigan and not Colorado law, it did not consider policies focused solely on pronouns but instead policies that broadly discriminated based on gender identity by also denying transgender individuals the ability to dress consistent with their gender identity, use restrooms consistent with their gender identity, and play on sports teams consistent with their gender identity. *Id.* at 845.

accommodation' as those terms are used in the public accommodation provisions of CADA." Doxa-2.App.344.

Retail-Appellants take a more nuanced approach, arguing that because H.B. 25-1312 says nothing about the harassment standard in Rule 81.6, H.B. 25-1312 must reflect a change in law, banning misgendering and deadnaming that goes beyond the level of harassment. XX-XY at 29; Doxa at 30. Not so. Again, all H.B. 25-1312 did was clarify the definition of "gender expression"; it made no changes to CADA's substantive prohibitions. As Rule 81.6 and the Division's analysis of complaints show, they have long considered any facts of misgendering and deadnaming in analyzing asserted CADA violations.

Moreover, because H.B. 25-1312 did not change CADA's substantive prohibitions, it cannot have altered CADA's incorporation of a harassment framework. That framework, which requires subjective and objective inquiries into whether conduct denies an individual full and equal enjoyment of a place of public accommodation, is reflected in the Division's longtime analysis of public accommodation cases, *see supra* Statement of the Case §(I)(B); reflected in Rule 81.6 as

31

to misgendering and deadnaming; and applies to numerous discrimination statutes, even when the statutory language does not specifically recite it. *See, e.g.*, 42 U.S.C. § 2000e–2(a)(1) (unlawful employment practice for employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of protected trait); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (interpreting this statutory language to prohibit harassment that is sufficiently severe or pervasive to change the terms and conditions of employment based on protected-class status).

Retail-Appellants cite to *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096 (10th Cir. 1991), *holding modified by O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004), for the proposition that "[t]he status quo is not defined by the parties' existing *legal rights*; it is defined by the *reality* of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." XX-XY at 28; Doxa at 28. They reason that here, the status quo is their "non-

32

compliance with the challenged provisions and the rule" and Appellees' nonenforcement of CADA against them. XX-XY at 28; Doxa at 29.

The "reality," however, is that Retail-Appellants have always been subject to CADA, and the Division and Commission have long interpreted CADA to prohibit misgendering and deadnaming when it rises to the level of harassment and thus denies a person full and equal enjoyment of a public accommodation. As a result, the last uncontested status between the parties was that CADA is valid and enforceable. An injunction precluding CADA enforcement against Appellants would change the parties' legal relationship by precluding the Division and Commission from enforcing CADA as they have long been able to do. *See also Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1150–51 (10th Cir. 2020) (rejecting request for preliminary injunction seeking to enjoin enforcement of ordinance where "the City has not applied, or threatened to apply" it to the plaintiff, reasoning in part that the requested injunction would not "preserve the status quo"). Retail-Appellants' cases do not suggest otherwise, as they involved (1) a suit to enjoin the government's recent effort to enforce a statute against the plaintiff, which enforcement action changed the status quo,

*see O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1178 (10th Cir. 2003), *on reh'g en banc,* 389 F.3d 973 (10th Cir. 2004), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), and (2) not a pre-enforcement challenge to a law, but a request for injunctive relief that would require defendant to approve a credit card order to plaintiff, which "would clearly have altered the status quo" because at the time of the motion, the plaintiff "was without the new cards, and [the defendant] was continuing to refuse to approve the order." *SCFC ILC, Inc.*, 936 F.2d at 1099.

DE-Appellants argue there is no "blanket rule" regarding injunctions altering the status quo, and that this Court instead should be guided by likelihood of success on the merits and the public interest. DE at 50. But the cases cited by DE-Appellants provide no basis to ignore the heightened standard applicable where a plaintiff seeks to alter the status quo; they do not even address preliminary injunctions. *See Labrador v. Poe*, 144 S. Ct. 921, 931 (2024) (Kavanaugh, J., concurring) (discussing Supreme Court's analysis of emergency applications); *United States v. Texas*, 144 S. Ct. 797, 798 n.2 (2024)

34

(addressing stay pending appeal). In sum, Appellants must make a stronger showing for injunctive relief because they are seeking to prevent enforcement of legal protections for transgender individuals that have existed for years.

## II. On likelihood of success, Appellants failed to make a clear showing of credible fear of CADA enforcement necessary for standing.

Despite Appellants' references to standing on pre-enforcement claims being subject to a "lenient standard," DE at 25-26; XX-XY at 30; Doxa at 31, they do not dispute that "[a]t the preliminary injunction stage, . . . the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008)). DE at 26; XX-XY at 24; Doxa at 24. Appellants must establish standing as to each Appellant and each challenged CADA provision, because "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 357 n.6 (1996); *see also Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, New Mexico*, 993 F.3d 802, 813 (10th Cir. 2021) (standing addressed "on a claim-by-claim basis"); *see, e.g.*, *DaimlerChrysler v. Cuno*, 547 U.S. 332, 353 (2006) (plaintiff's injury

caused by a municipal taxing scheme did not give it standing on separate claim to challenge a state tax scheme that did not injure it); *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 756–58 (10th Cir. 2010) (separately analyzing plaintiff's standing on each challenged provision). While standing is reviewed de novo, "the factual findings underlying the district court's standing determination [are reviewed] for clear error." *Fish v. Schwab*, 957 F.3d 1105, 1118 (10th Cir. 2020).

Because Appellants assert pre-enforcement claims, for standing they must make a clear showing they are likely to establish either (1) "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder,'" or (2) "'a credible threat of future prosecution' plus an 'ongoing injury resulting from the statute's chilling effect on [their] desire to exercise [their] First Amendment rights.'" *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (quoting *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003)).

On credible fear of enforcement—the only prong considered by the district court—courts in this Circuit consider at least three factors, including "(1) whether the plaintiff showed past enforcement against

the same conduct; (2) whether authority to initiate charges was not limited to a prosecutor or an agency and, instead, any person could file a complaint against the plaintiffs; and (3) whether the state disavowed future enforcement." *Id.* at 1132 (citations and quotations omitted).

In contrast to this framework, Retail-Appellants argue that this Court should adopt the presumption that a credible threat exists any time a "non-moribund" law "facially restricts" a plaintiff's expression, though they acknowledge that is not the standard this Court applies. XX-XY at 41; Doxa at 41–42. Retail-Appellants cite no persuasive authority that would support this Court jettisoning its current test to adopt such a rule, and most of the out-of-circuit cases cited by Retail-Appellants do not appear to adopt such a presumption and/or, at a minimum, they consider the underlying facts. *See, e.g., Hedges v. Obama*, 724 F.3d 170, 205 (2d Cir. 2013) (vacating permanent injunction after determining no plaintiff had standing); *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010) (holding that plaintiff had standing but case was not ripe); *New Hampshire Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 16 (1st Cir. 1996) (determining that political action committee had standing to challenge statute

capping political expenditures where Secretary of State confirmed statute would be enforced and Attorney General refused to disavow enforcement). Moreover, even if this Court were inclined to adopt such a standard, as explained above, CADA does not *per se* restrict misgendering and deadnaming and does not "facially restrict" Appellants' expression.

DE-Appellants, despite acknowledging the well-developed credible fear framework applied in this Circuit, argue that standing is "especially easy" where the speech at issue involves misgendering and deadnaming. DE at 25. DE-Appellants misstate the cases they rely upon. *Janus v. AFSCME*, 585 U.S. 878 (2018) did not hold, as asserted by DE-Appellants, that the plaintiff had standing because of the type of speech at issue. Rather, *Janus* held that a public employee that refused to join the union representing employees in his unit based on the union's speech had standing to challenge Illinois's agency-fee scheme allowing collection from non-members. *Id.* at 890. The *content* of the speech did not affect the standing analysis. Nor do any of the other cases apply a different standing inquiry based on the content of the speech at issue. *See, e.g.*, *Chiles v. Salazar*, 146 S. Ct. 1010, 1019

(2026) (standard to evaluate standing did not turn on whether plaintiff's speech involved sex and gender); *303 Creative v. Elenis*, 6 F.4th 1160, 1171 (10th Cir. 2021) (applying the Tenth Circuit standing standard with no apparent change based on content of speech). Rather, as acknowledged by this Court in *Gays Against Groomers v. Garcia*, 169 F.4th 981, 991 (10th Cir. 2026), the Court must apply "a disciplined framework for evaluating standing . . . to properly divorce our assessment of jurisdiction from our review of the merits."

Turning to the credible fear framework used by this Court, multiple bases exist for affirmance.

## A. Advocacy-Appellants cannot show credible fear because they are not places of public accommodation.

DE-Appellants offer no affirmative argument why Advocacy-Appellants are subject to CADA such that they have standing. DE-Appellants' silence is surprising, not only because they cannot simply lump all Appellants together and ignore their obligation to clearly establish standing as to all DE-Appellants, but because the parties fully

39

briefed this issue before the district court.[6] DE-1-App-258–61; DE-2-App-245–49; *See also Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130–31 (10th Cir. 2011) ("So it is that appellants must always shoulder a heavy burden—they must come ready *both* to show the district court's error and, when necessary, to explain why no other grounds can support affirmance of the district court's decision."); *United States v. Davis*, 339 F.3d 1223, 1227 (10th Cir. 2003) (this Court may affirm on any basis supported by the record).

The plain words of CADA and the record show that Advocacy-Appellants have failed to make a clear showing of credible fear of enforcement because CADA does not apply to them. CADA on its face prohibits discrimination in the context of providing "goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation." C.R.S. § 24-34-601(2)(a); *see also id.* § 24-34-701(1) (prohibiting activities tied to provision of "lodging, housing, schooling, or tuition or any accommodation, right, privilege, advantage, or

---

[6] Although the district court did not address this argument, on Appellee's Motion to Dismiss, the magistrate judge has recommended dismissal of Advocacy-Appellants and DE, who asserts associational standing based only on Advocacy-Appellants. DE-5-App-198–200.

convenience," "accommodations, rights, privileges, advantages, or conveniences of the place," or "patronage, custom, presence, frequenting, dwelling, staying, or lodging at the place"). Advocacy-Appellants admit that they advocate only, and offer no good, service, or accommodation to the public. DE-2-App-066–67, 31:2-17;38:1-23 (agreeing that for CPAN's activities listed in DE Action, DE-App-118 ¶44, "advocacy is the umbrella word that encompasses all of the other activities"); DE-2-App-077, 55:8-10; 55:19-24; DE-2-App-078, 59:4-21; DE-2-App-079, 60:4-10; DE-2-App-082, 64:1-4 (CPAN did not sell goods at various events); DE-2-App-088, 22:4-10; *see also* DE-2-App-089–90, 26:24-27:15 (agreeing that all activities PKC engages in are advocacy); 2-App-092, 27:16-18 (agreeing that PKC does not sell goods); DE-2-App-116, 36:14-19; DE-2-App-117–18, 37:5-38:6; DE-2-App-119, 52:6-15; DE-2-App-120, 54:1-12; DE-2-App-121–22, 65:19-66:9 (Dr. Morrell does not offer any medical services or products during his public speaking engagements); DE-2-App-113, 27:23-25; DE-2-App-114–15, 29:19-30:6; DE-2-App-123, 75:15-20; DE-2-App-124, 80:16-19; DE-2-App-125, 81:9-25; DE-2-App-127, 84:3-7 (Dr. Morrell uses his personal

name when engaged in public speaking and does not address his practice, Mountain West).

The Commission and Division have also disavowed enforcement as to Advocacy-Appellants, confirming in verified interrogatory responses that CADA does not apply to Advocacy-Appellants. DE-3-App-010–11. Indeed, public accommodation laws extend to those *operating* as such. *PGA Tour v. Martin,* 532 U.S. 661, 677 (2001) (Title III of ADA applies to lessor and operator of golf course that offers services to the public that include clinics and tournaments). Advocacy-Appellants are at most customers and users of places of public accommodation; they never stepped into the shoes of any place of public accommodation, *i.e.*, they never served food at restaurants or offered lodging at hotels they used. Nor can DE-Appellants point to any past enforcement of similar conduct—the Division has never found probable cause for a CADA violation by an advocacy organization because these entities do not offer "goods, services, facilities, privileges, advantages, or accommodations to the general public when they engage in lobbying, [or] 'coalition-building.'" DE-2-App-157–58 ¶¶18, 20.

DE-Appellants do not directly address how CADA may apply to Advocacy-Appellants but argue that they have a credible fear of enforcement because their speeches might induce someone to leave a place of public accommodation. DE at 39. The cases they cite do not support this "liability by transference" theory—that mere users of places of public accommodation may be liable for a violation of CADA. For example, *Hager v. Brinker Texas, Inc.*, 102 F.4th 692, 701 (5th Cir. 2024), did not acknowledge user liability; it determined that a Black family was denied full and equal enjoyment of a meal by the restaurant because they had to wait to be seated while White patrons were seated. And DE-Appellants even cite *Doe v. Mut. of Omaha Ins. Co.,* 179 F.3d 557 (7th Cir. 1999), for the proposition that the Americans with Disabilities Act applies to "operators" of places of public accommodation, but Advocacy-Appellants are not "operators," only users. Neither case supports that renting a place of public accommodation makes the Advocacy-Appellants themselves places of public accommodation and/or otherwise liable under CADA. And most importantly, these cases do nothing to rebut that the Division has unequivocally stated that CADA does not apply to Advocacy-

Appellants. C.R.S. §§ 24-34-601(2)(a); 24-34-701(1); DE-3-App-010–11.

Given these facts, Advocacy-Appellants have not made a clear showing

that they are likely to establish credible fear.

For the same reasons, DE, which only claims associational

standing through its members, cannot show a credible fear of

enforcement. *See* DE-2-App-007; *Hunt v. Washington State Apple

Advert. Comm'n*, 432 U.S. 333, 342–43 (1977) (association has standing

if its members do).

B. **The remaining Appellants cannot show credible fear of enforcement of the Publications Provisions.**

Appellants failed to make a clear showing of credible fear that the

Publications Provisions will be enforced against them. The Division and

Commission reviewed each proffered written statement by each

Appellant, and stated in verified interrogatory responses that "the

publications, standing alone, do not violate the [Publications

Provisions]." DE-3-App-015; XX-XY-2.App.0428; Doxa-2.App.343. The

Division and Commission explained their reasoning at length, including

that the proffered statements do not on their face state an intent to

deny an individual the full and equal enjoyment of a place of public

accommodation by, for example, stating "that transgender individuals are not welcome, that transgender individuals cannot purchase certain goods or receive certain services, or that transgender individuals will be charged more for goods or services." DE-3-App-013–14; XX-XY-2.App.0427; Doxa-2.App.342. The Division and Commission further explained that "[a]lthough the publications may suggest and/or state an intent to treat individuals differently based on gender identity, the publications do not establish that their application will create an environment that is subjectively and objectively hostile to individuals based on their gender identity," so as to rise to a CADA violation. DE-3-App-015; XX-XY-2.App.0428; Doxa-2.App.343.

Further supporting the lack of credible fear is that, as the district court found and the facts establish, "[t]he Division has not received any complaints against a place of public accommodation regarding its policy or publication on misgendering or deadnaming." DE-5-App-167; *see also* DE-3-App-0112; DE-4-App-042 ¶4 (stating the Division has received no complaints regarding written policies that misgender); DE-4-App-227 (same).

In opposition, DE-Appellants do not address their standing specific to the Publications Provisions, much less Appellees' evidence establishing the lack of a credible fear. This failure is fatal to their burden on standing. *See Lewis*, 518 U.S. at 357 n.6 (1996) (standing is not analyzed "in gross").

Retail-Appellants argue that the Division and Commission's disavowal is insufficient because it is based on their interpretation that CADA incorporates a subjective/objective harassment framework, which is not specifically articulated in the statutory text. XX-XY at 29, 36-37; Doxa at 30, 37-38. This is wrong several times over. First, the harassment framework is well-understood, reflected in Rule 81.6 as to misgendering and/or deadnaming, and applied more generally in antidiscrimination caselaw. *See Harris*, 510 U.S. at 21 (outlining Title VII harassment framework developed through caselaw interpreting the statutory language). Second, whether Appellants disagree with Appellees' statutory interpretation is of no matter, as the Division and Commission have provided an unequivocal disavowal as to the identified publications.

Retail-Appellants also argue that the Division and Commission's statements in litigation do not amount to a disavowal because they are not binding. XX-XY at 37; Doxa at 39. The cases cited by Retail-Appellants, however, involved merely *arguments* made during litigation and not the sworn and verified statements that the Division and Commission provided in this action. *See Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1192 (10th Cir. 2000) (rejecting that an argument made in brief was a disavowal); *N. Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) (similar). The statements at issue here, in sworn declarations and deposition testimony, are no less effective for having been made during litigation. *See St. Mary Cath. Par. in Littleton v. Roy*, 736 F. Supp. 3d 956, 985–86 (D. Colo. 2024), aff'd, 154 F.4th 752 (10th Cir. 2025) (finding disavowal of enforcement of contract provision during sworn testimony during litigation was an effective disavowal).

Finally, XX-XY suggests that the Commission and Division's written statements should not be given credence because their interrogatory responses changed over time and Director Sullivan allegedly equivocated during deposition. XX-XY at 37-38. Retail-

Appellants misstate the record. The Commission and Division supplemented their interrogatory response on XX-XY's written policy after XX-XY clarified that the interrogatory was limited to its written policy only. *See* XX-XY-2.App.0424–25 (supplemental response addressing "Pronoun Policy, in and of itself"). Director Sullivan's testimony confirmed this response, explaining that although she would consult with counsel on novel complaints, the policy does not violate CADA. *See* XX-XY-4.App.0870-873.

In sum, neither the Publications Provisions nor H.B. 25-1312, which is definitional only, prohibits a policy stating a general intent to deadname and/or misgender. The Commission and Division have confirmed as much, stating unequivocally and under oath that Appellants' written statements do not violate the Publications Provisions, and that they have never received a similar complaint. Given these facts, Appellants failed to clearly show a credible fear of enforcement of the Publications Provisions.

### C. The remaining Appellants cannot show credible fear for their proposed conduct on the Accommodations Provision.

In finding that Appellants failed to clearly show credible fear of enforcement of the Accommodations Provision, the district court stressed that "the specific facts at issue are important." DE-5-App-166. *See also Murthy*, 603 U.S. at 58 (where parties have taken discovery at the preliminary injunction stage, a "plaintiff cannot rest on 'mere allegations,' but must instead point to factual evidence"); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

The facts—or more to the point, the *lack* of specific facts regarding Appellants' proposed conduct—undermine Appellants' claim that they credibly fear enforcement. Appellants have offered that they intend to deadname and misgender, but provide none of the necessary details for purposes of analyzing whether their conduct might amount to a CADA violation. Missing are concrete facts necessary to assess whether any of Appellants' interactions may deny the full and equal enjoyment of a place of public accommodation based on gender expression, which could include, for example, the precise words and frequency of any misgendering/ deadnaming; whether the customer requested that the

49

Appellant use a particular form of address; the Appellant's response to that request, tone, and surrounding conduct; whether the interaction impaired or discouraged access to the Appellant's goods and/or services; and whether a reasonable customer would experience the entire interaction as a denial of full and equal enjoyment. *See* DE-3-App-009-10; XX-XY-3.App.0597; Doxa-2.App.339 (outlining potential considerations). Simply put, what those interactions may look like—and thus whether they might violate CADA by rising to the level of harassment—depends on the details. But Appellants offered no details that would allow Appellees and the Court to properly determine whether a dispute actually exists.[7] *See Schaffer v. Clinton*, 240 F.3d

---

[7] DE-Appellants suggest their vague assertions that they plan to misgender and deadname are sufficient, invoking a separate inquiry of pre-enforcement standing that they need only show that their conduct is "arguably proscribed" by CADA. DE at 37-38. Beyond addressing a separate inquiry not addressed by the district court, the "arguably proscribed" inquiry does not apply as loosely as DE-Appellants suggest. Rather, cases finding standing have involved specific conduct that the challenged statute on its face appeared to prohibit. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) ("*SBA List*") (discussing *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298-302 (1979) (standing where challenger raised concerns that inadvertent inaccuracies would violate a law that "on its face proscribe[d] dishonest, untruthful, and deceptive publicity"); *Virginia v. Am. Booksellers Assn., Inc.*, 484 U.S. 383, 386, 393 n.8 (1988) (standing

878, 883 (10th Cir. 2001) (federal courts must ensure they are presented only with concrete controversies that "sharpen[] the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions" (*quoting Baker v. Carr*, 369 U.S. 186, 204 (1962)). Not having done so, Appellants have not carried their burden on credible fear.

### 1. The district court correctly determined that the evidence weighed against Appellants on disavowal.

The district court determined that the disavowal inquiry weighed against Appellants where (1) Appellees provided "sworn declarations, deposition testimony, and discovery responses explaining that

---

where bookseller introduced 16 specific books it believed prohibited by statute making it a crime to "'knowingly display for commercial purpose'" material that is "'harmful to juveniles'" and state's attorney acknowledged it would "concede" that one of the books fell within the statute); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 8 (2010) (standing where "plaintiffs claimed that they had provided support to groups designated as terrorist organizations" when statute criminalized "'knowingly provid[ing] material support or resources to a foreign terrorist organization'"); *compare with Murthy*, 603 U.S. at 74–76 (no standing where plaintiffs claimed the government was censoring their speech but identified no ongoing actions taken by government defendants that would affect social media platforms' content moderation decisions and could not describe the content of the posts they wished to make).

[Appellants'] intended misgendering and deadnaming alone is not conduct that violates CADA *per se*—the conduct must rise to the level of harassment to be a violation;" (2) Appellants "have represented they will not deny their goods or services to anyone [such that] there is no violation of the statute on its face;" and (3) the Division and Commission "provided evidence" that they would not enforce the Accommodations Provision against Appellants under the facts presented. DE-5-App-167–68.

Each of these findings is well supported by the record. The Division explained that Appellants' proposed deadnaming and misgendering is not a *per se* violation of CADA but rather must rise to the level of harassment before the Division would pursue enforcement. *See* DE-3-App-006–10; XX-XY-2.App.0430–34; Doxa-2.App.334–39.

Further, Appellants readily assert that they offer their goods and services to anyone (and do so "happily" and/or with "courtesy"), yet they offer no details on what their intended interactions with transgender people may look like. *See* DE-3-App-218, 108:13-15; Doxa-1.App.031 ¶¶64–65; XX-XY-1.App.0054 ¶137; DE-3-App-011; XX-XY-2.App.0429; Doxa-2.App.0334–35. Given this lack of detail, Appellees offered a

disavowal commensurate with these facts—that because misgendering and deadnaming are not *per se* violations of CADA, Appellants' desire to engage in that conduct alone would not, absent other circumstances, trigger CADA liability. DE-3-App-009; XX-XY-2.App.433; Doxa-2.App.338.

In opposition, Appellants argue that the Division and Commission's statements are insufficient because they fail to promise nonenforcement of CADA against Appellants. XX-XY 31-32; Doxa 34; DE 28-29. Appellants ignore that the disavowal inquiry is "nuanced"— "[i]t is indeed unrealistic to expect a defendant to disavow a law's enforcement as applied to 'fluid and future facts' that are unclear at this time." *See CHC*, 117 F.4th at 850-51 (quoting *Hoye v. City of Oakland*, 653 F.3d 835, 859 (9th Cir. 2011)). In comparison, "refusing to disavow is less understandable—and enforcement more credible—where there is not 'a single additional fact that would be required to adjudicate the present action.'" *Id.* (quoting *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 929 (5th Cir. 2023). The Division and Commission offered a disavowal appropriate for the facts alleged, and Appellants offer no case weighing

this factor in favor of a plaintiff that offers such general and speculative facts.

Retail-Appellants also argue that Director Sullivan conceded that the Division might enforce CADA based on misgendering and deadnaming alone, or even a single instance of misgendering. Doxa at 34-35; XX-XY at 33-34. Retail-Appellants take Director Sullivan's testimony out of context. She testified repeatedly and consistently that whether such conduct rises to the level of harassment is highly fact-dependent and requires analysis of the full circumstances. *See* XX-XY-4.App.0877-79. As a result, Appellants' description of their intended conduct is insufficient to clearly show that it could result in CADA enforcement.

In sum, where Appellants have the burden and provided only the vaguest of allegations about their future conduct, Appellees gave as much assurance as the facts warranted—that misgendering and deadnaming alone are not a CADA violation, and analyzing any specific interactions would require analysis of the facts.

### 2. Appellants do not meet their burden to show past CADA enforcement for misgendering or deadnaming.

The second credible fear factor—whether Appellants can show past enforcement for the same conduct they wish to engage in—also weighs against finding credible threat of enforcement.

First, it is undisputed that the Division has never received a complaint against any of the Appellants. DE-2-App-158 ¶20; DE-2-App-160 ¶23; DE-2-App-161 ¶26. Certainly, the record shows that individuals regularly voice their disagreement with Appellants' views about transgender people. *See* DE-3-App-052–55 (complaints received by DNH and negative Google reviews of Dr. Morrell's practice); DE-7-App-004–06 (patient complaints received by Dr. Leswing); XX-XY-1.App.0270–74 (XX-XY calls and hate mail received by owners). But voicing disagreement or declining to patronize a business does not mean that a customer experienced any denial of the full and equal enjoyment of goods and services.

Moreover, the Division has never found probable cause for a charge alleging deadnaming and/or misgendering alone. Rather, the cases in which the Division found probable cause involved additional

facts beyond misgendering and deadnaming that demonstrate the denial of full and equal enjoyment of goods and services. *See* DE at 30–31, 42–43; XX-XY at 39–40; Doxa at 39–41. As described above in Statement of the Case §(I)(B), the Division found probable cause where a blood bank did not change a transgender woman's marker in the system to "female," which led to her being subject to extra screening. DE-6-App-142–45. The finding was based on the different treatment the complainant experienced, not merely on the gender marker. And the Division found probable cause where a nightclub refused to let a customer use the women's bathroom and ejected the customer from the club.[8] DE-6-App-170–79.

Appellants argue that past high-profile litigation involving CADA enforcement, which involved discrimination claims based on sexual orientation, evidence a credible threat of enforcement here. DE at 29-30;

---

[8] DE-Appellants cite a third case in the employment context in which the Division found probable cause where a manager "constantly and consistently" misgendered the employee of a marijuana business and called him "it." DE at 42, citing DE-6-App-077. This case, which involved an employer-employee relationship, does not concern a public accommodation's denial of full and equal enjoyment and thus does not reflect past enforcement against the "same conduct" Appellants wish to pursue.

XX-XY at 33-34; Doxa at 34-35. But Appellants' proposed conduct is different from *303 Creative*, 600 U.S. at 580, and *Masterpiece Cakeshop v. Colo. Civil Rights Commission*, 584 U.S. 617 (2018), in which businesses refused service, or planned to refuse service, to couples planning same-sex marriages. Those cases involved alleged denials of service and/or goods that violated the Accommodations Provision and did not address misgendering and deadnaming. *303 Creative*, 600 U.S. at 582; *Masterpiece Cakeshop*, 584 U.S. at 626.[9]

DE-Appellants also argue that because H.B. 25-1312 was enacted relatively recently, it is irrelevant whether there is evidence of past enforcement. DE at 27-28, 40-42. But that ignores Rule 81.6, which

---

[9] DE-Appellants mischaracterize other cases as "coerc[ing] speech on gender identity." DE at 29-30. But two of these do not involve misgendering at all. *Chiles*, 146 S.Ct. at 1018-19 (law regulating form of mental health treatment); *St. Mary Cath. Parish v. Roy*, 154 F.4th 752, 757 (10th Cir. 2025), *cert. granted*, 2026 WL 1052111 (U.S. Apr. 20, 2026) (law forbidding children's exclusion from publicly funded preschool). The third involves a pre-enforcement suit brought by a preschool asserting that its treatment of transgender four-year-olds might be found to deny them equal educational opportunity in violation of a public funding statute. The preschool raised a number of issues, but it has no clear policies regarding what names it calls preschoolers, including no clear policy stating that it will misgender children. *Darren Patterson Christian Academy v. Roy*, 688 F. Supp. 3d 1163, 1171 (D. Colo. 2023).

was promulgated in 2009 and provides that misgendering and deadnaming can amount to a CADA violation when they rise to the level of harassment. 3 CCR 708-1, Rule 81.6(A)(4). Indeed, by claiming that the Division's probable cause findings in past cases involving misgendering show past enforcement against the same conduct, DE-Appellants recognize that the Division has long had authority to pursue CADA enforcement based on gender expression discrimination. DE at 29–31. By contrast, the cases cited by DE-Appellants addressed new laws that enacted new legal requirements. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 395–98 (1988) (addressing new law that Supreme Court certified to the state's supreme court for interpretation); *Bryant v. Woodall*, 1 F.4th 280, 286–87 (4th Cir. 2021) (amendments changed the challenged aspects of the North Carolina abortion laws "in a number of aspects"); *Cerame v. Slack*, 123 F.4th 72, 86 (2d Cir. 2024) (change to state bar rules of professional conduct was new and intended to "go beyond" the previous rule).

## D. The district court properly weighed all factors in its credible fear analysis.

In the PI Order, the district court analyzed and applied all the credible fear factors in its decision. DE-5-App-164–70. Having

determined that disavowal and lack of past enforcement weighed against credible fear, it found that the fact that anyone may submit a charge of discrimination to the Division carries little weight. DE-5-App-170. This result makes sense, as allowing the possibility of private complaints to subsume the other two factors would render them meaningless.

Appellants may argue, as Retail-Appellants did below in a recent notice of supplemental authority opposing Appellees' pending motions to dismiss, that the Supreme Court's recent decision in *National Republican Senatorial Committee v. Federal Election Commission*, 146 S. Ct. 2404 (2026) ("*NRSC*"), supports the conclusion that they have a credible fear of enforcement because of the prospect of private lawsuits under CADA if the Division and Commission decline to act on a complaint of discrimination.[10] *See* C.R.S. § 24-34-306(2)(b)(I)(B), (15); *303 Creative*, 6 F.4th at 1174. In *NRSC*, intervenors argued the suit

---

[10] Below, the district court approved the R&R's conclusion that the prospect of private CADA litigation if the Division declines to act on a discrimination complaint weighed *against* the issuance of a preliminary injunction, because an injunction against Appellees would not cure the need for Appellants to choose between declining to deadname and misgender and risking exposing themselves to CADA complaints. DE-5-App-163.

was moot because defendant the Federal Election Commission ("FEC") would not enforce the challenged legal provisions, which it had declined to defend in litigation. The Supreme Court concluded there was an ongoing justiciable dispute because of the possibility that private plaintiffs could file suit under the challenged law if the FEC failed to act. *NRSC*, 146 S.Ct. at 2414-15. However, *NRSC* does not support finding credible fear of enforcement here.

First, in *NRSC*, there was no disavowal of enforcement weighing against a finding of credible fear. Though intervenors assumed the FEC would no longer enforce the challenged legal provisions, the FEC flatly disputed that assertion. It clarified in briefing that the Executive Branch had decided not to defend the challenged law in court, "not that it will stop enforcing the statute." Reply Brief for Federal Respondents at 5, *National Republican Senatorial Committee v. Federal Election Commission* 146 S. Ct. 2404 (2026) (No. 24-621). By contrast, here, there is no credible threat of enforcement by Appellees, for the reasons described above.

Second, in *NRSC*, the Supreme Court did not hold that the mere availability of private enforcement in the statute created Article III

jurisdiction. Instead, though it did not identify the evidence supporting its finding, the Court concluded that "the threat of private enforcement [wa]s sufficiently credible" to create an ongoing dispute. *NRSC*, 146 S.Ct. at 2414-15. And unlike in *NRSC*, where intervenors bore the burden of proving mootness, *West Virginia v. EPA*, 597 U.S. 697, 719 (2022), Appellants here must establish standing, *SBA List*, 573 U.S. at 158.

Third, the prospect that private plaintiffs may file suit in court if the Division and Commission decline to pursue CADA charges cannot by itself create standing for Appellants to obtain preliminary injunctive relief against Appellees. The Supreme Court made clear in *Whole Woman's Health v. Jackson* that a plaintiff cannot rely on the threat of private suits under a challenged law to establish a case or controversy against a government defendant that would not independently enforce that law against the plaintiff. *See* 595 U.S. 30, 38-45 (2021) ("[N]o court may lawfully enjoin the world at large, or purport to enjoin challenged laws themselves." (quotation marks and internal citation omitted)).[11]

---

[11] Although this Court's three-part test for assessing credible fear, grounded in the Supreme Court's decision in *SBA List*, takes into

61

Finally, even if Appellants could rely on the threat of private suits to establish an injury in fact, any such injury would simply not be traceable to Appellees and thus could not establish standing to pursue the preliminary injunction. *NRSC*—a case about mootness—did not address traceability at all.

In sum, the district court properly weighed all three credible fear factors in its ruling.

## III. The district court correctly found that Appellants have not carried their burden on the remaining preliminary injunction factors.

While Appellants' lack of standing alone justifies denying their request for preliminary relief, the district court also correctly held that Appellants failed to meet their burden on the remaining preliminary injunction factors. *See Winter*, 555 U.S. at 19. Because they have no credible fear of imminent enforcement, Appellants cannot establish that

---

account whether the plaintiff faces a risk of public complaints against them under a challenged law, that inquiry is different. To determine whether a plaintiff has standing to assert pre-enforcement claims against the government defendant, the relevant inquiry is whether the public can file complaints *with the government defendant*, such that public complaints might trigger government enforcement proceedings. *See SBA List*, 573 U.S. at 164 (finding substantial threat of enforcement where "any person" could file complaints with the defendant commission, prompting commission enforcement proceedings).

they would face irreparable harm absent an injunction. DE-5-App-170–71. The absence of any imminent irreparable injury is bolstered by the fact that rules have long been in place barring harassment that involves misgendering or deadnaming, and Appellants facially challenge provisions of CADA that have been in place for decades, as applied to all of CADA's protected traits—not only gender expression, the one trait impacted by H.B. 25-1312's recent amendments. Appellants' lengthy delay undermines their claim of irreparable injury. *See Kan. Health Care Ass'n v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536 (10th Cir. 1994); *see also Heidman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (holding the injury must be "certain, actual and not theoretical" (internal quotations omitted)).

Appellants have also failed to show that the balance of harms or public interest favors preliminary relief. As the R&R correctly concluded, the State has compelling antidiscrimination interests in the public accommodation context, *see 303 Creative*, 600 U.S. at 590, and here these interests outweigh any risk of harm to Appellants, particularly given that they seek disfavored relief that would alter the

status quo.[12] DE-5-App-129; *see also* DE-2-App-178–79. The district court correctly rejected Appellants' objections to the R&R, concluding that Appellants' allegations of constitutional harm did not trump all other considerations relevant to the preliminary injunction analysis, particularly given their lack of credible fear of enforcement. DE-5-App-170-71. The district court's weighing of these equitable factors was not an abuse of discretion.

IV. **Should this Court nevertheless find a credible fear of enforcement, it should remand for the district court to consider Appellees' other threshold arguments in the first instance.**

Even if this Court concludes Appellants have met their burden on the credible fear inquiry, there are multiple additional reasons why Appellants cannot show a likelihood of success on the merits, as Appellees argued below. If this Court does not affirm the denial of the preliminary injunction, it should remand for the district court to

---

[12] The extraordinarily broad scope of Appellants' requested relief tips the equities even more decisively in Defendants' favor. Appellants seek to enjoin Defendants from enforcing broad provisions of CADA that reach far beyond the acts of misgendering or deadnaming, including the definitions of "gender expression" and "chosen name" as amended by H.B. 25-1312 in their entirety, as well as certain of CADA's provisions prohibiting discrimination on the grounds of any protected trait. *See* DE-1-App-112; XX-XY-1-App-84; Doxa-1-App-70.

address those alternative grounds for denial—nearly all of which present jurisdictional questions on which Appellants bear the burden—in the first instance.

*Standing:* To establish standing, Appellants must show not only a credible threat of enforcement, but also that their conduct is arguably proscribed by CADA. As Appellants readily acknowledge, the PI Order did not address that question. DE at 20 n*; XX-XY at 30; Doxa at 32. Appellants' conduct is not, in fact, "arguably proscribed" by CADA, because they have alleged only that they intend to misgender and deadname. CADA, however, reaches such actions only when they rise to the level of denying full and equal enjoyment of a public accommodation. It does not—even arguably—proscribe misgendering and deadnaming *per se*. Nor did the district court address whether each Appellant had clearly shown "an 'ongoing injury resulting from the statute's chilling effect on [their] desire to exercise [their] First Amendment rights.'" *Peck*, 43 F.4th at 1129 (quoting *Ward*, 321 F.3d at 1267).

Further, the PI Order did not separately address whether Appellants face a credible threat of enforcement by the Attorney

General. The Attorney General does not enforce CADA; the Division and Commission do, and Appellants have not identified a single instance in which the Attorney General has previously exercised his limited authority to file a charge of discrimination under Parts 6 or 7 of CADA.

*Ripeness:* This Court should also remand for the district court to consider whether Appellants' claims are constitutionally and prudentially ripe. Appellants' asserted intent to misgender and deadname presents only an abstract dispute, given that CADA does not *per se* prohibit such conduct. And because the questions of whether CADA might prohibit Appellants' conduct, and how CADA's application to that conduct would implicate Appellants' constitutional rights, will depend highly on the factual context in which Appellants misgender or deadname, their claims are also not prudentially ripe.

*Sovereign immunity:* The PI Order did not address the Attorney General's sovereign immunity defense. As the Attorney General argued below, Appellants' claims are barred by the Eleventh Amendment because the Attorney General may only serve as a complainant under CADA—he lacks a particular duty to enforce it—

66

and in any event, Appellants have alleged no facts to show that the Attorney General has a demonstrated willingness to even file a complaint under Parts 6 or 7 of CADA. Thus, the *Ex parte Young* exception to sovereign immunity does not apply, and Appellants are not entitled to relief against the Attorney General. 209 U.S. 123 (1908).

Appellants urge the Court to skip over these additional, threshold questions and rush straight to deciding the merits of their constitutional claims and entry of an injunction. DE at 43; XX-XY at 43; Doxa at 45. That invitation should be rejected, for multiple reasons.

First, as a general matter, this Court generally does not address issues not reached by the district court. *Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1227 (10th Cir. 2013) ("Where an issue has not been ruled on by the court below, we generally favor remand for the district court to examine the issue."). The district court denied preliminary relief because Appellants had not established a credible threat of enforcement sufficient for standing, but it did not reach Appellees' other arguments on standing, ripeness, or sovereign

immunity, all of which similarly bear on whether Appellants can establish a likelihood of success on the merits. Each presents a substantial question as to the federal court's jurisdiction, and this Court should remand for the district court to address them in the first instance.

Second, Appellants bear the burden of establishing jurisdiction. Yet before this Court, they have not even addressed Appellees' alternate standing arguments, ripeness, or the Attorney General's sovereign immunity. Instead, they assume that if the Court disagrees with the district court on credible fear, it should jump directly to the merits and direct entry of an injunction. But Appellees cannot discharge their burden—especially when seeking "extraordinary relief"—by simply ignoring the jurisdictional issues that Appellees have consistently raised and the district court did not reach below. *See Richison*, 634 F.3d at 1130–31. None is so straightforward as to be "beyond any doubt," such that this Court should address it in the first instance. *Singleton*, 428 U.S. at 121.

Appellants argue that this Court may direct entry of an injunction by analyzing the remaining preliminary injunction factors

itself. But the cases they cite do not support this Court addressing Appellees' alternate justiciability arguments, which the district court did not reach and Appellants did not raise here. *See Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 908 (10th Cir. 2022) (concluding the "unique circumstances" of that appeal, in which a federally recognized tribe sought to enjoin ongoing state court proceedings, warranted "deviat[ing]" from the Court's "usual practice" of remanding for the district court to weigh the remaining injunction factors); *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009) (addressing circumstances where, unlike here, the "district court fails to analyze the factors necessary to justify a preliminary injunction"). Accordingly, it is appropriate to remand to the district court to rule on those arguments in the first instance.

Finally, while Appellants note that Appellees did not argue the merits of their constitutional claims below, Appellees were "justified" in doing so, given the numerous jurisdictional issues implicated here. *See Singleton*, 428 U.S. at 120 ("[P]etitioner should have the opportunity to present whatever legal arguments he may have in defense of the statute. We think he was justified in not presenting

those arguments to the Court of Appeals, and in assuming, rather, that he would at least be allowed to answer the complaint, should the Court of Appeals reinstate it."). If this Court vacates the district court's PI Order, it should remand for additional proceedings.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's denial of the preliminary injunction.

Dated: August 7, 2026

PHILIP J. WEISER
Attorney General

s/ *Janna K. Fischer*

JANNA K. FISCHER
Senior Assistant Attorney General
NORA Q.E. PASSAMANECK
Senior Assistant Attorney General
HELEN NORTON
Deputy Solicitor General
DOMINICK D. SCHUMACHER
Assistant Attorney General
Colorado Attorney General's Office
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: (720) 508-6000
Email: janna.fischer@coag.gov
          nora.passamaneck@coag.gov
          helen.norton@coag.gov
          dominick.schumacher@coag.gov
  *Attorneys for Defendants-*
*Appellees Aubrey C. Sullivan, Sergio*
*Cordova, Geta Asfaw, Mayuko*
*Fieweger, Daniel S. Ward, Jade R.*
*Kelly and Eric Artis, in their official*
*capacities*

s/ *Talia Kraemer*

TALIA KRAEMER *
Senior Assistant Attorney General
LANE TOWERY*
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: 720-508-6000

Email: talia.kraemer@coag.gov
lane.towery@coag.gov
*Counsel of Record
   *Attorneys for Defendant-Appellee
Attorney General Weiser, in his official
capacity*

## STATEMENT REGARDING ORAL ARGUMENT

Appellees believe that oral argument is appropriate and will assist the court in reaching a decision.

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)[[*select and include one:* (A) *[30 pages principal brief / 15 page reply brief] or* (B) *[no more than 13,000 words]*]] because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☒    This document contains __12,953___ words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6):

☒    This document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook type.

s/  *Janna K. Fischer*